940 So.2d 389 (2006)
Richard ENGLAND, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-1521.
Supreme Court of Florida.
May 25, 2006.
As Revised on Denial of Rehearing September 28, 2006.
*393 Todd G. Scher, P.L., Miami Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Richard England appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the conviction and sentence.

I. FACTUAL AND PROCEDURAL BACKGROUND
On July 2, 2001, after receiving a call from concerned neighbors, the City of Daytona Beach police found the body of Howard Wetherell in the shower of his master bathroom. Wetherell had been brutally beaten to death. He had multiple lacerations, fractures, and bruises over his body.[1] N. Leroy Parker, a Florida Department of Law Enforcement crime lab analyst and expert in the field of blood stain pattern analysis, analyzed the blood stain pattern in the upstairs master bedroom of Wetherell's condominium. He determined the pattern indicated that Wetherell was beaten while conscious and moving in different positions in several different locations in that room including on or near the floor, next to the door, near the dresser, and near the nightstand next to the bed.
The State's investigation of the crime scene was impeded by a white, powdery substance that had been sprayed over the bloody floor and furniture to cover up and destroy any potential evidence underneath, including fingerprints. However, crime scene investigators noticed that the poker was missing from the fireplace tools in the living room. They also recovered two cigarette butts from a second upstairs bedroom. Ultimately, Florida Department of Law Enforcement analyst Tim Pietre determined that the DNA on one of these cigarette butts belonged to Michael Jackson, and DNA on the other belonged to Richard England. Numerous items of value were missing from the condominium including antique guns, jewelry, silver, and the victim's green Mercury Sable automobile. Notably, a Rolex watch was found in the pocket of a pair of Wetherell's trousers.
Before the crime occurred, Michael Jackson lived with Wetherell trading sex for money and a place to stay. Several days after the murder, he was arrested in Walton County after wrecking Wetherell's green Mercury Sable. Shortly after his arrest, he gave a statement to State Attorney Investigator Shon McGuire implicating his friend, Richard England, in Wetherell's murder.
England was not immediately charged for this murder but was taken into custody within weeks of the murder for an unrelated violation of probation (VOP) charge.[2] *394 While incarcerated, England was questioned about Wetherell's murder by Investigator McGuire. Prior to and after this questioning, England gave several inculpatory statements. He also made statements to a fellow inmate. Cumulatively, these statements revealed that England knew of Wetherell through Jackson and was at the condominium the night of the murder; that he and Jackson stole property from the condominium and took the stolen property to Reynaldo DeLeon, a friend of England's in Orlando, so that DeLeon could fence it; and that on their way to DeLeon's home Jackson disposed of a bag of bloody rags and the missing fire poker, which was later determined to be the murder weapon.
On December 21, 2001, Investigator McGuire executed a search warrant on England to obtain a blood sample in order to compare England's DNA to that recovered from one of the cigarette butts found in Wetherell's condominium. England asked to speak to McGuire alone. During this interview, England offered to help find the murder weapon if he could get some consideration on his VOP charge. He said that he had been at the victim's condominium on June 25 when Jackson got a rod and went upstairs. England said he heard the victim screaming and yelling, "Why are you hitting me?" England said he did not go upstairs and never touched the victim. Instead, he went outside to smoke a cigarette, and when Jackson came downstairs they left. As stated earlier, the DNA on one of the cigarette butts found in the second upstairs bedroom matched England's.
On November 6, 2003, a grand jury in Volusia County, Florida, returned a two-count indictment against England. Count one alleged that on or about June 25, 2001, England killed the victim either in a premeditated manner, during the course of a robbery or attempted robbery of the victim by the use of blunt force trauma, or "by aiding, abetting, counseling, hiring, or otherwise procuring such offense to be committed by Michael Jackson." Count two alleged armed robbery of the victim with a deadly weapon (a metal rod).
At trial, the State called several witnesses to testify regarding England's involvement in Wetherell's murder. DeLeon testified via a translator that England came to his house with Jackson. They brought antique guns, jewelry, and silver.[3] England told DeLeon that Jackson had hit a man, stolen the items, and then went to find England. England also said that he and Jackson went back to the man's house and found him alive, so England hit the man with a fire poker until he died.
The State called Steven Diehl, a jail house informant, who testified that he met England in jail in mid-December and that he and England had several conversations about Wetherell's murder. England first *395 told Diehl that he was innocent and that Jackson committed the murder. Later, England told Diehl that he bludgeoned "an old pervert" to death with a pipe and that the victim deserved it because he had been engaging in sexual relations with a young man. England said he and Jackson took items they had stolen from the man's house to a drug dealer friend of England's in Orlando and that England said he regretted leaving behind a Rolex watch. England also admitted that he left a cigarette butt at the house but planned to cover this mistake by saying that he had been partying at the house a few days earlier. England insinuated that he committed the murder alone but could beat the charges because the evidence was all circumstantial. England also told Diehl that he was going to have someone write a letter in Spanish to the drug dealer in Orlando, DeLeon, asking him not to testify. Finally, England asked Diehl to sign an agreement that he would not testify against him.
The State also called Jackson's brother, Samuel, to testify about what Jackson had told him about the murder. Samuel testified that Jackson told him that Jackson and England committed the crime together. According to Samuel, Jackson stated that he and England took their clothes off and went into the victim's bedroom. They gave the victim a "hellish" beating. The victim screamed, hollered, and begged for his life; but Jackson and England told him to shut up and kept beating him until he died.
The State also introduced physical evidence into the record as well as testimony involving evidence that had been destroyed. The physical evidence included (1) crime scene and autopsy photographs used during the medical examiner's testimony to assist his description of the extent and nature of the victim's injuries, (2) a photograph recovered from the crime scene,[4] and (3) telephone records showing calls made from Wetherell's number on the night of the murder to friends of England's who did not know Jackson or Wetherell. The testimony involving evidence that had been destroyed was given by Ivy Evans, a long time friend of England's, and DeLeon. Evans testified about telephone calls received the night of the murder. She testified that England left a message on the answering machine for her husband. She had erased the message, so the tape recording was not available as evidence at trial. DeLeon testified about a letter he received asking him not to testify against England. DeLeon had destroyed the letter, so it also was not available as evidence at trial.
The defense called Jackson to testify.[5] Prior to the trial, Jackson had made a number of statements to the police.[6] In those statements, Jackson said that England committed the murder. He said he *396 and England decided to rob Wetherell, and while they were committing the robbery they heard a noise upstairs. England then stripped naked, picked up the fire poker, went upstairs, and hit Wetherell thirteen to fifteen times with the poker. Jackson said Wetherell was running around the room, hitting the wall, falling, and pushing things out of the way. After Wetherell died, they tried to get rid of any evidence connecting them to the crime. They put Wetherell's body in the shower; England got in the shower and rinsed off; England spread white powder around saying it would take off the fingerprints; and England wiped everything down with white socks.
At trial, Jackson recanted these prior statements. Jackson testified that he alone killed Wetherell with the fire poker because Wetherell was a pervert and that England did not assist. Jackson said that he gave the prior statements implicating England because he thought it was an easy way out. He thought that if he could give the police somebody else as a suspect, they would let him go.
Jackson also testified that England had smoked cigarettes in Jackson's second floor bedroom the night before the murder. He said that although England was at the condominium on the night of the murder, he left and they met up later. Jackson said that he returned to Wetherell's condominium around 3 a.m. intending to kill and rob Wetherell. Jackson said he then got the fire poker, went upstairs, and beat Wetherell until he was dead even though the victim yelled, struggled, and asked Jackson to stop. Jackson dragged the body to the shower, took his clothes off, and showered with the body. Jackson said he wiped things down in the house even though he lived there, sprayed fire extinguisher powder everywhere, went through the house looking for valuables placing them in the living room, and then passed out. The next day Jackson loaded the victim's car with the stolen items and drove to a Burger King where he threw away blood-soaked clothing and the fire poker. He testified that England did not become involved until after the murder but that England did help get rid of the stolen items by meeting with DeLeon on June 26. England also took Jackson to Titusville to meet Jackson's brother, Samuel. Jackson denied telling Samuel that he and England had committed the murder.
When confronted on cross-examination with Samuel's testimony that he had told Samuel that he and England killed Wetherell together, Jackson said his brother was just trying to protect him. At one point during his trial testimony, when asked about the details of the beating, Jackson said, "No, I didn't do nothing; I just was there." He later said, "I did it all." Jackson further testified that he was changing his earlier deposition statements because the State was seeking the death penalty against England.
On May 24, 2004, the jury returned guilty verdicts against England for both first-degree premeditated murder and felony murder and robbery with a deadly weapon. During the penalty phase, England made several outbursts that led the trial judge to order him gagged. Following the penalty phase, the jury returned an eight-to-four advisory sentence recommending death. A Spencer[7] hearing was held on July 9, 2004. On July 23, 2004, England was sentenced to death on count I and to a concurrent life sentence on count II.

II. ISSUES ON APPEAL
England raises fourteen issues on appeal. These claims include: (A) fundamental *397 error occurred because Jackson's testimony included a reference to facts excluded by the trial judge; (B) the jury should have been presented with a special verdict form; (C) certain crime scene and autopsy photographs should not have been admitted because they were gruesome and overly prejudicial; (D) the trial judge admitted testimony in violation of the best evidence rule; (E) the trial judge erred in permitting certain testimony from witness DeLeon; (F) there was juror misconduct; (G) the trial judge erred in finding the heinous, atrocious, or cruel (HAC) aggravator; (H) the trial judge violated England's right to a fair sentencing hearing by gagging England during the penalty phase; (I) England's right to testify was violated; (J) the trial judge erred in refusing to permit reverse Williams[8] rule evidence during the penalty phase; (K) the trial judge treated England disparately from codefendant Jackson in sentencing; (L) England's death sentence violates Roper;[9] (M) England's death sentence was not proportional; and (N) England's death sentence violates Ring.[10] None of these claims warrant relief.

A. Fundamental Error

England first claims fundamental error occurred when Jackson mentioned England's prior offense during cross-examination by the State. In the totality of the circumstances, Jackson's statement does not constitute fundamental error. See Lugo v. State, 845 So.2d 74, 100 (Fla. 2003) (finding improper statements do not constitute fundamental error based on the totality of the circumstances where improper statement went without objection from defense counsel).
England was previously convicted of second-degree murder in the 1987 death of Robert Ryland. In fact, he was on probation for that offense at the time of Wetherell's murder. Prior to trial for Wetherell's murder, the trial judge had granted England's motion in limine to preclude any mention of this prior murder. On cross-examination in the guilt phase, the State questioned Jackson about a conversation he had with his brother Samuel:
Q. Do you remember telling your brother Sam [about the murder] as you were riding in the car up to Walton County?
A. I told him what I did. Hehe told [the police] his version to try to help me out I'm sure.
Q. So now among law enforcement the law enforcement is playing a game or lying against you and now your brother is included in this; is that what you are saying here?
A. I'm saying he lied to help me out, yeah.
Q. And do you remember telling your brother that?
A. "Put it off on Rich. He's already got a murder charge. You'll get off easy."
Q. So I want to make this clear. I want to make this absolutely clear. Are you saying that you did not tell your brother Sam, the one that you went running to, the one that you confided in, that you and Rich beat Mr. Wetherell to death?
A. No.
England's counsel did not object to Jackson's statement, "Put it off on Rich. He's already got a murder charge. You'll get off easy."
*398 This one, nonresponsive statement does not constitute fundamental error. To be fundamental error, an improper statement such as this must "reach[ ] down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error." Doorbal v. State, 837 So.2d 940, 954-55 (Fla.2003) (quoting McDonald v. State, 743 So.2d 501, 505 (Fla.1999)); see also Chandler v. State, 702 So.2d 186, 191 n. 5 (Fla.1997) (describing fundamental error as error which is "so prejudicial as to vitiate the entire trial").
It cannot be said that the guilty verdict in this case could not have been obtained without the assistance of this alleged error.[11] First, only this one statement was made during the trial in violation of the court's order in limine. This nonresponsive, unelaborated statement by Jackson during the defense's case is buried in over one hundred pages of Jackson's own testimony. Moreover, it was preceded by multiple days of other evidence linking England to Wetherell's murder during the State's case-in-chief. The State allowed Jackson's unresponsive statement to pass without further elaboration or comment, and defense counsel did not draw further attention to it by objecting. Indeed, no other mention of the prior murder or this statement was ever made during the trial. Second, without any such elaboration, further comment, or other evidence about the prior offense, the jury could have believed that Jackson was referring to the murder of Wetherell. In fact, this is one of the reasons defense counsel gave for not objecting and moving for a mistrial.[12] Third, without this statement, it is clear that the State could still have obtained the guilty verdict. There is abundant evidence, including England's own admissions, tying him to the commission of this murder. No fundamental error has been established.

B. Special Verdict Form

England next claims that a new trial is necessary because the jury should have been presented with a special verdict form distinguishing between first-degree premeditated murder and felony murder. England is not entitled to a new trial on this basis. Both the United States Supreme Court and this Court have repeatedly rejected similar claims. See Schad v. Arizona, 501 U.S. 624, 645, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); Johnson v. State, 750 So.2d 22, 26-27 (Fla. 1999). In Schad, the Supreme Court held that the United States Constitution did not require the jury to come to a unanimous decision on the theory of first-degree murder and that separate verdict forms for felony and premeditated murder were not required. 501 U.S. at 645, 111 S.Ct. 2491. In Johnson, this Court held that trial courts need not "submit special verdict forms to the jury regarding the alternate *399 theories of felony first-degree murder and premeditated first-degree murder." 750 So.2d at 26-27.

C. Autopsy and Crime Scene Photographs

England's third claim is that the trial judge erred by admitting gruesome and overly prejudicial photographic evidence. The following additional facts are necessary to explain our resolution of this claim.
At trial, the State sought to introduce five exhibits incorporating eleven enlarged photographs to assist the medical examiner's presentation of his testimony. The photographs depicted the victim's body both as found at the crime scene and during the autopsy. Given the passage of time between the crime and the discovery of the body, these photographs reveal the victim's body in a state of decomposition and bloating.
The first set of these exhibits, exhibits 16 and 17, are crime scene photographs showing the location and position of the body in the shower, the items that were placed on top of the body, and the way the body was dragged across the room to the shower. In exhibit 16, the victim's genitals are exposed. In exhibit 17, law enforcement technicians are seen removing items (towels and pieces of plastic) that were covering the victim's half-exposed body.
The second set of exhibits, exhibits 57, 58, and 59, are autopsy photographs taken and used by the medical examiner, Dr. Beaver, to illustrate his autopsy findings to the jury.[13] These photographs show the victim's head, torso, and hands in a moderately decomposed state with extensive discoloration, skin sloughing off, and insect larvae on the wounds. These photographs were introduced to show that Wetherell was alive and attempting to defend himself, the extent of his suffering, and the mechanism of death.
The defense sought to exclude these photographs due to their gruesome nature. At the evidentiary hearing on the motion to exclude, the State claimed the photographs would not only assist the medical examiner in showing the manner of the victim's death but also were probative in establishing the HAC aggravator. After screening the photographs, the trial judge agreed with the State and ruled that the photographs in question were relevant for the guilt phase to show the extent of the wounds, the defensive nature of some of the wounds, and the manner of death. He also ruled that they were pertinent to the HAC aggravator argued in the penalty phase. The photographs were later admitted by the State in both the guilt and penalty phases.
On appeal, England asserts that the trial judge erred in admitting these photographs because they were inflammatory and irrelevant and violated his constitutional right to a fair trial. We have long held that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance. See Bush v. State, 461 So.2d 936, 939-40 (Fla.1984); Williams v. State, 228 So.2d 377, 378 (Fla.1969). "Photographs are admissible if `they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted.'" Brooks v. State, 787 So.2d 765, 781 (Fla.2001) (quoting Bush, 461 So.2d at 939). The admission of photographic evidence of a murder victim is within the sound discretion of the trial court, and absent abuse, the trial judge's ruling will not be disturbed on appeal. Floyd v. State, 808 So.2d 175, 184 (Fla. 2002).
*400 All of the photographs were relevant to both the guilt and penalty phases. Exhibits 16 and 17, the crime scene photographs, were relevant to show the position of the body as found by the police and the manner of death. See Looney v. State, 803 So.2d 656, 669 (Fla.2001) (finding photographs relevant to assist the crime scene technician in explaining the condition of the crime scene when the police arrived). Exhibits 57, 58, and 59 were similarly relevant to establishing the manner and cause of death. They were also relevant to the HAC aggravator. They show the location and extent of Wetherell's wounds and Wetherell's efforts to defend himself. See Brooks, 787 So.2d at 781 (finding that autopsy photographs showing defensive wounds on victim's hands and arms and depicting bruises and hemorrhaging were relevant to the determination of the manner of the victim's death); see also Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (finding photographic evidence relevant to show the circumstances of the crime and establish HAC aggravator admissible). Moreover, Dr. Beaver explained to the jury that the discoloration, condition of the skin, and insect larvae were factors of decomposition, not results of the murder itself. Consequently, all of the photographs were relevant and none were so shocking as to defeat the value of their relevance.
This Court has instructed "trial judges to scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point." Marshall v. State, 604 So.2d 799, 804 (Fla.1992). The trial judge in this case abided by these instructions. He engaged in a preliminary screening of the photographs, determined that the photographs were clearly relevant to both the manner of death and the HAC aggravator, and ensured they were nonduplicative. He did not abuse his discretion in admitting these photographs into evidence.

D. Best Evidence Rule

In his fourth claim, England asserts that certain evidence presented through the testimony of two witnesses violated the best evidence rule. The best evidence rule, codified in section 90.952, Florida Statutes (2005), provides that "[e]xcept as otherwise provided by statute, an original writing, recording, or photograph is required in order to prove the contents of the writing, recording, or photograph." A trial judge's ruling on evidentiary issues will not be disturbed absent an abuse of discretion. Fitzpatrick v. State, 900 So.2d 495, 514-15 (Fla.2005).
First, England claims that the trial judge should not have allowed Ivy Evans to identify England's voice on an answering machine message when the recording itself could not be produced. At trial, Evans testified for the State that she received a telephone call early on July 26, 2001, and heard England asking for her husband, David, on their answering machine. Evans testified that she and David had known England since he was a teenager. Evans erased the message after listening to it. Defense counsel objected to the testimony, and the trial judge overruled the objection.[14]
*401 England argues that the trial judge violated the best evidence rule by permitting Evans to testify that she identified England's voice from the answering machine. This argument is without merit because the best evidence rule does not apply. Evans's testimony was not offered to prove the content of what was on the answering machine tape. Instead, it was offered to establish that she recognized the voice on the tape as England's. Testimony regarding recognition of the voice of the accused is admissible as direct and positive proof of identity. Martin v. State, 100 Fla. 16, 129 So. 112, 115 (1930). Therefore, the trial judge did not err, much less abuse his discretion, in admitting the testimony.
Next, England asserts that the trial judge violated the best evidence rule in permitting DeLeon to testify to the contents of a letter. DeLeon testified that he received a letter which referred to DeLeon as "The P," a name only England used for him. The letter was not in England's handwriting, but it asked DeLeon not to testify against England. Defense counsel objected to this testimony because the letter could not be produced. DeLeon testified that he "threw it out" out of fear that someone would find the letter.
As stated earlier, the best evidence rule provides that "[e]xcept as otherwise provided by statute, an original writing, recording, or photograph is required in order to prove the contents of the writing, recording, or photograph." § 90.952, Fla. Stat. (2005). However, there is an exception to this rule. "The original of a writing, recording, or photograph is not required . . . and other evidence of its contents is admissible when . . . [a]ll originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith." § 90.954, Fla. Stat. (2005) (emphasis supplied). Here, the original writing is unavailable, and there is no evidence or assertion that the State, the proponent of the destroyed writing, lost or destroyed the letter in bad faith. The only evidence is that DeLeon destroyed the letter because his life could be in danger in prison. Therefore, this exception to the best evidence rule applies. Under these circumstances, the trial judge did not err in admitting DeLeon's testimony as to the contents of the letter.

E. Admissibility of Witness Testimony

In his fifth claim, England argues that the lower court erred in permitting DeLeon to testify to a fact we have yet to mentionthat England told DeLeon he would kill Michael Jackson. At trial, DeLeon testified that he told England that Jackson was going to get caught because he was driving the victim's car. England responded by saying, "If he got me in trouble I would kill him." The trial judge properly admitted this evidence as a showing of England's desire to evade prosecution.
We have previously held that "[e]vidence that a suspected person in any manner endeavors to evade a threatened prosecution by any ex post facto indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from such actions." Heath v. State, 648 So.2d 660, 664 (Fla.1994). Moreover, "a defendant's attempt to intimidate a state witness is relevant and admissible." Id. In light of this authority, the trial judge did not err in admitting this testimony.

F. Juror Misconduct

England also contends that the trial judge erred in denying a motion for a mistrial based on juror misconduct during the guilt phase. A motion for a mistrial *402 should only be granted when an error is so prejudicial as to vitiate the entire trial. Snipes v. State, 733 So.2d 1000, 1005 (Fla. 1999). A trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review. Perez v. State, 919 So.2d 347 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2359, 165 L.Ed.2d 285 (2006). England has not satisfied this standard.
During the guilt phase, England moved for a mistrial. This motion was based upon the allegation of a witness who would later testify on England's behalf in the penalty phase. The witness claimed that he overheard one juror say to another juror "he's guilty" in reference to England. The trial judge took testimony from both the juror who allegedly made the comment and the juror who allegedly received the comment. Both jurors denied that the comment was made. After receiving this testimony and defense counsel's argument, the trial judge denied England's motion for a mistrial.
"It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity." Thomas v. State, 748 So.2d 970, 980 (Fla.1999) (citing Salvatore v. State, 366 So.2d 745, 750 (Fla.1978)). Moreover, addressing allegations of juror misconduct is left to the sound discretion of the trial judge. Doyle v. State, 460 So.2d 353, 357 (Fla.1984). Here, the trial judge thoroughly investigated the allegations made by one of England's mitigation witnesses, received the relevant testimony, and determined there was no misconduct. The trial judge did not abuse his discretion in accepting the jurors' testimony and denying the motion for a mistrial.

G. HAC Finding

In his seventh claim, England challenges the trial judge's finding of the HAC aggravator. Our review of such claims is limited to determining whether the trial judge applied the correct rule of law and, if so, whether competent, substantial evidence supports his finding. Hutchinson v. State, 882 So.2d 943, 958 (Fla. 2004).
The trial judge found that the victim was both conscious and aware of the attack. Specifically, he found that the beating was particularly brutal. Evidence established that the victim begged for his life but was told to shut up, moved around the bedroom while fending off blows, experienced significant pain before losing consciousness, and eventually died by a blow to the head that was so severe it fractured his spine.
This Court has "consistently upheld HAC in beating deaths." Lawrence v. State, 698 So.2d 1219, 1222 (Fla.1997); see also Dennis v. State, 817 So.2d 741, 766 (Fla.2002) (holding trial court's finding of HAC was supported by evidence that the victims suffered skull fractures as the result of a brutal beating and that the victims were conscious for at least part of the attack); Bogle v. State, 655 So.2d 1103, 1109 (Fla.1995) (holding trial court's finding of HAC was supported by evidence that the victim was struck seven times in the head and the medical examiner testified that the victim was alive at the time most of the wounds were inflicted); Wilson v. State, 493 So.2d 1019, 1023 (Fla. 1986) (holding trial court's finding of HAC was supported by evidence that victim was brutally beaten while attempting to fend off blows to the head before he was fatally shot). The trial judge applied the proper rule of law, and competent, substantial evidence supports the HAC aggravator.

*403 H. Gagging

England next argues that the trial judge violated his constitutional right to a fair sentencing hearing by gagging him in view of the jury without providing a cautionary instruction. The facts relevant to this claim are set out below.
Beginning early in the trial, England's courtroom behavior was inappropriate. He repeatedly made improper comments in the presence of the jury. For example, when his girlfriend and witness, Karen Duggins, entered the courtroom, England said, "Karen, I love you" loud enough for both the judge and clerk to hear. England also waved his hand and smiled when the prosecutor asked Duggins to identify him. The trial judge advised England he should not say anything to the witnesses and should talk to his attorneys before he made gestures. During Investigator McGuire's testimony, England blurted out:
THE DEFENDANT: Will you tell the Court where I was getting that information from, that I was being framed for murder?
DEFENSE COUNSEL KEATING: Stop it. Your Honor, can we have a recess?
THE DEFENDANT: I was being framed for murder.
KEATING: Stop it. Your Honor, can we have a recess, please.
THE COURT: Sit down. Folks, need you to step out.
THE DEFENDANT: Let them know where I was getting the information from.
(Jury out.)
The trial judge then advised England:
Mr. England, can't have it, doesn't work that way. Got to try and play by the rules here. You may not like what's said. I'm sure you won't on some matters, and some matters you'll like what was said, but you can't blurt out like that.
The trial judge warned England that "if you do that again, I'm going to gag you and put you in your seat. You cannot blurt out like that or I will gag you."
This warning did not dissuade England. He engaged in at least four more outbursts by inappropriately addressing the jury and the judge, by accusing the prosecutor of lying, and by admonishing witnesses. Each time, he was warned that if he did not behave properly, he would be gagged. Finally, the judge ordered England to be gagged during the penalty phase closing arguments. After the security officer gagged England, he reported to the judge that England told him that the outbursts were an intentional attempt to get a mistrial. Closing arguments concluded without incident. After the jury was instructed and retired, the trial judge told defense counsel that if England would assure the court there would be no further outbursts, the gag would be removed. Upon receipt of such assurance, the judge ordered the tape removed from England's mouth.
We review this claim for fundamental error because it was not preserved for appeal. It was not preserved because trial counsel did not meet the requirements of section 924.051, Florida Statutes (2005), by "appris(ing) the trial court of the relief sought and the grounds therefor." § 924.051(1)(b), Fla. Stat. (2005). In response to the trial judge's order to gag England during the closing arguments in the penalty phase, defense counsel stated only, "Please don't gag him." This statement did not apprise the judge of the relief sought or the grounds therefor. Therefore, this issue is not properly preserved and must be reviewed for fundamental error. Fundamental error at the *404 penalty phase "must be so prejudicial as to taint the jury's recommended sentence." Peterka v. State, 890 So.2d 219, 243 (Fla. 2004), cert. denied, 545 U.S. 1118, 125 S.Ct. 2911, 162 L.Ed.2d 301 (2005).
No fundamental error occurred. This Court has long held that the use of restraints, such as a gag, is within the trial court's sound discretion. Elledge v. State, 408 So.2d 1021, 1022-23 (Fla.1981). Therefore, a decision to use restraints will be reversed only on a showing of abuse. Id. at 1023. This standard is consistent with the United States Supreme Court's most recent ruling on the issue of restraint in a death penalty case. According to that Court, while routine restraint of defendants during the penalty phase of a criminal trial is unconstitutional, restraint itself is not wholly prohibited. Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007, 2008-09, 161 L.Ed.2d 953 (2005). Specifically, according to the Court in Deck, the constitution "permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. . . . [A]ny such determination must be case specific; that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial." Id. at 2015. The decision to gag England was not a matter of routine practice. It reflected the particular and appropriate concerns of this trial judge who was, at the end of the trial, confronted with an obstreperous defendant intent on manufacturing a mistrial.
Certainly, a judge must use care when ordering a defendant gagged, as it is "possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, [and] the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." Jackson v. State, 698 So.2d 1299, 1302 (Fla. 4th DCA 1997) (quoting Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). Therefore, "such a confinement should be used only as a last resort in extreme situations." Id. However, when such restraint is necessary, there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant such as England: (1) bind or gag him, thereby keeping him present; (2) cite him for contempt; or (3) take him out of the courtroom until he promises to conduct himself properly. Allen, 397 U.S. at 344, 90 S.Ct. 1057.
The trial judge in this case certainly did not commit fundamental error by gagging England at this late stage of the trial. England was warned approximately seven times that he was going to be gagged if he continued to disrupt the trial proceedings. The trial judge provided England numerous opportunities to curb his outbursts prior to the gag order. Once England had been gagged, the trial judge specifically ordered that England's hand be free to write notes to his attorneys. He also limited the time period of the restraint. Under the circumstances, it is not reasonable to assume that the threat of contempt would have dissuaded England. Though a cautionary instruction from the judge to the jury is certainly preferable in such circumstance (particularly if requested by counsel), the absence of such an instruction does not make this restraint improper.

I. Defendant's Right to Testify

England also claims that the trial judge abused his discretion in not permitting England to fully testify on his own behalf during the penalty phase. Both section 921.141(1), Florida Statutes (2005), and Florida Rule of Criminal Procedure 3.780 provide that a defendant will be permitted to present evidence of a mitigating *405 nature that the court deems relevant to the nature of the crime and the character of the defendant. A trial judge has discretion in determining what is admissible as mitigating evidence. As with other evidentiary rulings, a trial judge's ruling on the admissibility of mitigating evidence will not be disturbed absent an abuse of that discretion. See Fitzpatrick, 900 So.2d at 514-15.
The trial judge determined that most of England's testimony went to the issue of guilt rather than mitigation and prohibited it. "This Court has followed the holding of the United States Supreme Court that there is no constitutional right to present `lingering doubt' evidence" related to the guilt of the defendant. Darling v. State, 808 So.2d 145, 162 (Fla.2002). Because England had already been found guilty during the guilt phase of the trial, he had no constitutional right to have evidence addressing his guilt heard during the penalty phase. The trial judge did not abuse his discretion in limiting this testimony.

J. Williams Rule Evidence

In his tenth claim, England argues that the trial court erred in refusing to permit the introduction of reverse Williams[15] rule evidence during the penalty phase regarding codefendant Jackson's involvement in an unrelated attempted murder case. "A trial court's exclusion of evidence of similar crimes committed by another person for exculpatory purposes, generally referred to as `reverse Williams rule evidence,' is subject to an abuse of discretion review." Huggins v. State, 889 So.2d 743, 761 (Fla.2004), cert. denied, 545 U.S. 1107, 125 S.Ct. 2546, 162 L.Ed.2d 280 (2005). The trial judge did not abuse his discretion in excluding this evidence.
During the penalty phase, England filed a notice of intent to introduce reverse Williams rule evidence. England claimed this evidence would establish relevant mitigation that Jackson was the actual perpetrator, whereas England's participation was relatively minor. The evidence took the form of codefendant Jackson's involvement in the July 2000 attack of a homosexual man, James Beamon. Jackson had been living with Beamon and allegedly attempted to murder him in a fashion similar to the murder of the victim in this case. The judge granted England's motion in part, concluding that there was "clear and convincing evidence" that Jackson was Beamon's assailant and that there were "striking similarities between the instant murder charge and the prior crime."[16] Thus, the trial judge concluded that due to the uncertainty about whether Jackson would testify at trial, the defense could introduce the evidence outside the presence of the jury and seek a ruling from the court at that time, subject to impeachment and the State's Williams rule evidence against England.[17] Ultimately, the trial judge refused to admit the evidence.
*406 Under section 921.141(5)(d), Florida Statutes (2005), a trial judge is permitted to consider as mitigating evidence in the penalty phase that a defendant was an accomplice in the capital felony and that his participation was relatively minor. However, "residual or lingering doubt of guilt is not an appropriate mitigating circumstance" in the sentencing phase of a capital case. Sims v. State, 681 So.2d 1112, 1117 (Fla.1996).
England's counsel argues that he sought to introduce this evidence in the penalty phase to establish that England was an accomplice. However, at trial, England's own testimony and outbursts clearly show that the defense wanted to introduce the evidence for the purpose of showing his innocence in Wetherell's murder. Reverse Williams rule evidence for this purpose is improper in the penalty phase. While this evidence may have been admissible in the guilt phase of the trial, England entered into a stipulation with the State during the guilt phase that neither party would use Williams rule type evidence in the guilt phase of the trial. The evidence was inadmissible at the penalty phase where the sole purpose for seeking to have the evidence admitted was to show residual or lingering doubt of his innocence.

K. Disparate Treatment

In his eleventh claim, England argues that because the trial judge found him and Jackson equally culpable, his death sentence is disparate in light of Jackson's life sentence. Jackson pled to second-degree murder and, as a part of his plea agreement, gave the State information and recorded testimony implicating England.
The law on such claims is clear. "[I]n instances where the codefendant's lesser sentence was the result of a plea agreement or prosecutorial discretion, this Court has rejected claims of disparate sentencing." Kight v. State, 784 So.2d 396, 401 (Fla.2001); see also San Martin v. State, 705 So.2d 1337, 1350-51 (Fla.1997) (upholding court's rejection of codefendant's life sentence as a mitigating circumstance where codefendant's plea, sentence, and agreement to testify for the State were the products of prosecutorial discretion and negotiation); Brown v. State, 473 So.2d 1260, 1268-69 (Fla.1985) (finding that death sentence was proper even though accomplice received disparate prosecutorial and judicial treatment after pleading to second-degree murder in return for life sentence). England's sentence is not disparate.

L. Applicability of Roper

England next claims that Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), prevents the application of the death penalty in his case. England *407 argues that because the trial judge based two aggravating factors on felony convictions for crimes that occurred before England was eighteen years of age, Roper prohibits the imposition of the death penalty. In Roper, the United States Supreme Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Roper, 543 U.S. at 578, 125 S.Ct. 1183. The Court provided a bright line rule for the imposition of the death penalty itself, but nowhere did the Supreme Court extend this rule to prohibit the use of prior felonies committed when the defendant was a minor as an aggravating circumstance during the penalty phase. This claim has no merit.

M. Ring Claims

England makes two arguments related to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). First, he argues that his individual death sentence is unconstitutional. Second, he argues that Florida's statutory scheme itself violates Ring. Both arguments are without merit.
England gives three reasons why his individual death sentence is unconstitutional: (1) the jury did not unanimously find him death-eligible; (2) the aggravating circumstances were not charged in the indictment; and (3) the aggravating circumstances were not found beyond a reasonable doubt by the jury. We address each reason sequentially. First, "[t]his Court has repeatedly held that it is not unconstitutional for a jury to recommend death on a simple majority vote." Parker v. State, 904 So.2d 370, 383 (Fla.2005); see also Whitfield v. State, 706 So.2d 1 (Fla. 1997); Thompson v. State, 648 So.2d 692, 698 (Fla.1994); Brown v. State, 565 So.2d 304, 308 (Fla.1990); Alvord v. State, 322 So.2d 533, 536 (Fla.1975). Second, "we have rejected claims that Ring requires the aggravating circumstances to be alleged in the indictment." Ferrell v. State, 918 So.2d 163, 180 (Fla.2005). A defendant is not entitled to notice of every aggravator in the indictment because the aggravators are clearly listed in the statutes. Lynch v. State, 841 So.2d 362, 378 (Fla.2003) (citing Vining v. State, 637 So.2d 921, 928 (Fla.1994)). Third, one of the aggravators in this case is the prior violent felony aggravator, which both the United States Supreme Court and this Court have recognized as an exception to the requirement that the jury must make all the findings necessary to enhance a defendant's sentence. Ring, 536 U.S. at 597 n. 4, 122 S.Ct. 2428; see also Patton v. State, 878 So.2d 368, 377 (Fla.2004) ("The existence of this prior violent felony aggravator satisfies the mandates of the United States and Florida constitutions. . . ."); Kormondy v. State, 845 So.2d 41, 54 n. 3 (Fla.2003) (finding the prior violent felony aggravator through contemporaneous charges of robbery, sexual assault, and battery included in the indictment and affirmed by the jury satisfies Ring's requirements).
England next argues that Florida's statutory scheme itself violates Ring. This Court has previously addressed and rejected this claim. See, e.g., Bottoson v. Moore, 833 So.2d 693 (Fla.2002); King v. Moore, 831 So.2d 143 (Fla.2002).

N. Proportionality

Finally, this Court conducts a review of each death sentence for proportionality, regardless of whether the issue is raised on appeal. Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). To ensure uniformity in death penalty proceedings, "we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of *408 the sentence." Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citations omitted).
In England's case, the jury recommended death with a vote of eight to four. The trial judge found four aggravating factors beyond a reasonable doubt: (1) that England was under felony probation; (2) that he had a prior violent felony conviction; (3) that the murder was committed during a robbery; and (4) that the murder was especially heinous, atrocious, or cruel; and no statutory mitigators.[18] He did find strong nonstatutory mitigators and afforded them great weight collectively.[19] The trial judge determined that the exceptionally strong aggravators of a prior felony conviction and the heinous, atrocious, or cruel murder of Wetherell clearly outweighed the substantial mitigation put on by the defense. While the judge was impressed by England's potential as a person, he stated that he could not ignore the horrible, brutal, bone-crushing beating of Wetherell by England, that England previously committed another murder that was very similar to this murder, and that the murder was committed while England was still on probation for a former felony. The trial judge then sentenced England to death. We affirm.
Proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). Instead, the Court looks at the totality of the circumstances to determine if death is warranted in comparison to other cases where the sentence of death has been upheld. Id. This Court has made clear that HAC is one of the "most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). The trial judge found no statutory mitigating circumstances and numerous nonstatutory mitigating circumstances to which he gave great weight. England's sentence is proportional in relation to other death sentences that this Court has upheld. See, e.g., Johnston v. State, 841 So.2d 349, 361 (Fla.2002) (finding death sentence proportional where four aggravators were found, including prior violent felony conviction and murder committed during commission of sexual battery and kidnapping; moderate weight was given one statutory mitigator; and slight weight or no weight was ascribed to twenty-six nonstatutory mitigators); Singleton v. State, 783 So.2d 970, 979 (Fla.2001) (finding sentence proportional where two aggravators were found, including prior violent felony conviction; three statutory mitigators were found, including defendant's age (69), impaired capacity, and extreme mental or emotional disturbance; and several nonstatutory mitigators *409 were found, including that defendant suffered from mild dementia); Mansfield v. State, 758 So.2d 636 (Fla.2000) (upholding death sentence where two aggravators, HAC and that murder was committed during the commission of a sexual battery, outweighed five nonstatutory mitigators). Therefore, we find death a proportionate sentence.

III. CONCLUSION
For the reasons expressed above, we deny each claim raised on appeal and affirm England's conviction and sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Ultimately, it was determined that Wetherell died of a blunt force trauma cervical spine fracture that severed his spinal cord and vertebral arteries causing him to suffocate to death as his diaphragm muscles were paralyzed from the fracture.
[2] England was arrested in August 2001 for violating his probation from a 1987 murder conviction. He later argued that the VOP arrest was subterfuge to take him into custody without the benefit of an attorney. England did, however, have an attorney on the VOP charge, and he insisted on negotiating with the State for release on the VOP charge in return for information regarding Wetherell's murder.
[3] DeLeon paid England for the items in cocaine and cash and later sold some of them. DeLeon was arrested for drug trafficking on September 25, 2001. The same day, Karen Duggins, England's girlfriend, called and told him to dispose of the property England had given him because England had been arrested and detectives were looking for the property. DeLeon took the property to a hotel to hide it, but the police recovered the items when they arrested him. DeLeon was facing life imprisonment on the drug charges. In light of his cooperation in this case, DeLeon received a thirty-year sentence with twelve years suspended.
[4] The photograph found at the crime scene and entered into evidence had the words "Pervert, fk with us" written across the face with an arrow pointing to the victim. Don Quinn, handwriting expert, examined the handwriting on the photograph and compared it to exemplars from England and Jackson. In Quinn's opinion, Jackson did not author any of the text, but England "very probably" did write the text.
[5] Jackson had been scheduled to go to trial for Wetherell's murder on September 8, 2003. On September 7, Jackson took a plea to second-degree murder, armed robbery, and credit card theft. He agreed to testify against England based on a taped statement. At trial, Jackson became a defense witness and testified that he was trying to withdraw his plea.
[6] Jackson made three pretrial statements: two were made during interviews to investigators on July 31 and August 16, 2001, and one while sworn to the prosecution and defense attorneys on September 7, 2003.
[7] Spencer v. State, 615 So.2d 688 (Fla.1993).
[8] Williams v. State, 110 So.2d 654 (Fla.1959).
[9] Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).
[10] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[11] Even if counsel had objected and preserved the claim for analysis under the harmless error standard, no relief would be warranted. See, e.g., Cole v. State, 701 So.2d 845, 853 (Fla.1997) (finding trial court did not err in finding no grounds for mistrial where witness testified that defendant had a "history" when evidence of defendant's prior criminal record had been ruled inadmissible in limine because reference was inadvertent, isolated, and not focused upon); Sireci v. State, 587 So.2d 450, 452-53 (Fla.1991) (finding trial court did not err in finding no grounds for mistrial where, on retrial, prosecutor inadvertently referred to defendant's prior death sentence previously ruled inadmissible in limine).
[12] At the Spencer hearing, defense counsel testified that he purposely decided not to object at the time or request a mistrial. He believed that Jackson's overall testimony had helped England's case; the statement was minor; and the jury could have believed Jackson was talking about the present murder.
[13] Dr. Beaver performed the autopsy of Wetherell on July 3, 2001.
[14] Evans's testimony was supported by State witness Claude Dove, a security manager with Bell South, who testified that a call was made to the Evans' household from Wetherell's condominium on that date. Dove testified from a "call detail" document that calls were made from Wetherell's condominium to two different places on June 25 and 26, 2001. A telephone call was made at 9:40 p.m. on July 25, 2001, to the home of Karen Duggins, where England sometimes stayed. Calls were also made at 4:25, 4:26, and 5:01 a.m. on July 26, 2001, to Ivy and David Evans' home.
[15] Williams, 110 So.2d 654.
[16] Among the similarities the court found between Jackson's assault on Beamon and the facts of the instant case were: (1) the beatings were accomplished with solid objects; (2) the beatings were to the heads and faces of both victims; (3) the beatings were very brutal; (4) there was much blood splatter; (5) weapons were not located in either crime; (6) both victims were older white males; (7) both victims were homosexuals; (8) Jackson lived with both victims as a "hustler"; (9) both victims wanted Jackson to leave; (10) the attacks took place in the victims' homes; (11) property was taken from both victims; (12) attacks took place in the evening or very early morning; (13) the beatings resulted in severe injury or death. The court did note some dissimilarities between Jackson's assault on Beamon and the facts of the instant case, but found they were insubstantial.
[17] Based on a statement by Johnny Towner, the State had its own Williams rule evidence regarding previous acts by England. During a proffer, the State read the deposition of Towner into evidence. Towner met England at a halfway house in Volusia County in 1987. He and England met Robert Ryland at an adult bookstore, and Ryland offered them a place to stay. England said something about robbing Ryland. Towner was in the bedroom in his underwear when Ryland came in and took his clothes off. When England finished taking a shower, he walked into the bedroom wearing a towel and hit Ryland in the face with a motorcycle muffler. Ryland said he was going to kill England. England kept hitting Ryland after he fell to the floor. Towner and England left the victim for dead, found the keys to Ryland's car, and stole the car. Ryland later died. Towner pled guilty to accessory to the murder and robbery. He received a sentence of seven years in prison followed by eight years' probation. He and England discussed their theory of the defense and agreed to say Ryland tried to rape Towner. England was convicted of the second-degree murder of Ryland, and the State introduced this judgment and sentence.
[18] The trial judge found that no statutory mitigating factors had been reasonably established. He considered and rejected: (1) the no significant history or prior criminal activity mitigating factor; (2) the mitigator regarding the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; (3) the under the influence of an extreme mental or emotional disturbance mitigator; and (4) the age mitigator. The judge found that England was a full and actual participant in the murder and, together with Jackson, actually beat Wetherell.
[19] The sentencing order stated:

The defense, despite not being allowed enough time by the Defendant to fully develop the sentencing phase, was able to portray the Defendant's other side. . . . [T]hey showed him to be intelligent, a quick learner, a hard worker. He is personable, trustworthy, a leader, a good friend, and capable of a loving relationship. He is all of these things despite a terrible childhood full of abuse, uncertainty and abandonment. . . . The Defendant was torn from his siblings and raised by [an] abusive man.