CASANUEVA, Chief Judge.
 

 Reginald L. Smith made contact with a prostitute on the street, invited her into his car, drove to a nearby motel, and then, after exiting his car, surreptitiously disposed of a prescription pill bottle into a trash can when he saw a police cruiser approach. Unbeknownst to Mr. Smith, the prostitute had been under surveillance for illegal activities, and the surveilling undercover officer became suspicious of Mr. Smith because of his actions with the bottle of pills. The undercover officer retrieved the bottle from the trash can after determining that no one had approached the trash can before or after Mr. Smith had availed himself of it and that there were no other similar bottles in the can. An examination of the contents of the bottle confirmed the undercover officer’s suspicions that it contained crack cocaine. Based on his activities, the State prosecuted Mr. Smith for driving without a valid license and possession of cocaine, and the jury convicted him as charged.
 

 On appeal from these convictions, Mr. Smith raises three issues, only one of which, issue two, merits extended discussion and requires reversal for a new trial.
 

 In issue two, Mr. Smith complains of his treatment during the second day of trial. We are cognizant of the great lengths to which the trial judge went to afford Mr. Smith the fullest exercise of his rights despite his behavior during trial that can only charitably be described as fractious and argumentative. We commend her efforts in dealing with this difficult defendant except for keeping him immobilized by strapping his arms and legs to an “extraction chair” in front of the jury during the second day of trial.
 

 Not only had Mr. Smith caused needless delay in starting his trial, his lengthy cross-examination of the State’s witnesses during the first day consisted mainly in arguing with the witnesses, asking irrelevant questions, and trying to give his own testimony. In the intervening night between the first and second days of trial, he complained of medical problems that prompted jail personnel to transport him to the hospital. Hospital staff found nothing wrong with him after conducting several tests and x-rays and cleared him for transport back to the courthouse around noon the next day. When the judge resumed the trial that afternoon, courthouse bailiffs informed her that he was lying on a bench, complaining again of medical problems. More delay ensued so jail medical personnel could be summoned. They examined him, found nothing amiss, and cleared him to return to the courtroom.
 
 *1083
 
 Mr. Smith then refused to leave the holding cell, so a “cell extraction team” was called. This team forcibly placed him in a specialized chair with his legs and arms strapped down and transported him in this manner to the courtroom, still dressed in jail orange.
 

 Once in the courtroom, the judge, by now understandably nearing the end of her patience, spoke with Mr. Smith:
 

 THE COURT [After detailing the medical issues of the preceding night]: The jail medical unit responded over to the courtroom. Mr. Smith was again medically cleared. This is just within an hour of his being medically cleared at Bayfront Hospital. Mr. Smith refused to voluntarily come into the courtroom to begin his trial. He was advised that the extraction team would come over from the jail, and that is a special unit with Sheriffs Office with black suits and helmets to physically put Mr. Smith in a chair restrained and physically brought into the courtroom against his will, and he was advised that that is how we would proceed if he chose not to voluntarily come in. At no time did he indicate he would voluntarily come in.
 

 Now we are here with Mr. Smith. The extraction team is in the courtroom. The jury has not been present for any of these discussions and is still' — we are about to start the trial.
 

 Mr. Smith are you willing to cooperate at this point?
 

 MR. SMITH: Yes, ma’am. And for the record, ... just now you were talking about, like, I ain’t have no problems or whatever. When the medical people came to take my blood pressure, my blood pressure was 182 over 18[sie]. And when I went to the hospital, like, they did say I had problems, and they done sent all type of paperwork for them to, like, give me different medications.
 

 Like, what I saying is not correct and I did not refuse to come in here. I told the people I come in here.
 

 THE COURT: Ms. Cardenas [the prosecutor], did you speak with staff at Bay-front Hospital today?
 

 MS. CARDENAS: Yes, your Honor. And they medically cleared him. All the labs didn’t show anything.
 

 THE COURT: Okay. And you actually spoke to them on more than one occasion. One was regarding his initial complaints?
 

 MS. CARDENAS: Yes, your Honor. They did some labs, and I was told they were going to clear him. But he was complaining of chest pain. So they were going to do some more labs, and they also did an x-ray which was looked at by a doctor who decided then to medically clear him after reviewing the x-rays. THE COURT: Okay. Thank you. All right. Mr. Smith, would you like me to appoint Mr. Landrigan
 
 [1]
 
 to finish up the rest of your trial today?
 

 MR. SMITH: Well, for the record, like, I will move under Administrative Rule 2.380 for you to recuse yourself for showing bias and for the record, like, that the Prosecutor, she just came in knowingly and willingly committed perjury saying that the people, like, said there wasn’t nothing wrong with me. Like, the people not sent my paperwork here for them to give me different type of medication. And before I left there,
 
 *1084
 
 like, they gave me a lots of pills that, like, I thought I was fixing to OD or something like my head was spinning. My body was numb. I couldn’t even use my legs. They had to bring me here in a wheelchair. I couldn’t even walk, like.
 

 So I’m just putting that on the record that, and I ain’t refuse to come in the courtroom. And one of the bailiffs went out there and told the people that I asked them to bring the wheelchair back there so I could get in the wheelchair and put on my clothes. And then they just shut the door and start looking at me laughing and joking and all that, like, my life a joke or something like that. I do have medical problems.
 

 THE COURT: Okay. Your — your— MR. SMITH: And I don’t see how-like, I know the medical people wouldn’t tell you that somebody with 182 over 118 blood pressure don’t need to be checked out or something, like. And I am still right now, like, woozy and whatever, like — like, I feel like I’m high and all that. I don’t know what kind of pills they gave me at Bayfront, like.
 

 THE COURT: Okay. Well, you—
 

 MR. SMITH: Somebody need to check me and see that they, like, gave me too many pills, like.
 

 THE COURT: And, Mr. Smith, I’m not at all insensitive to medical concerns and problems. But you have just been medically cleared at Bayfront Hospital and by the jail within the last hour.
 

 And your oral motion for disqualification is denied. And do we have the corporal from the Sheriff here in the courtroom?
 

 THE BAILIFF: Yes, ma’am, we do, your Honor.
 

 THE COURT: And, corporal, procedurally today did your agency advise Mr. Smith that the extraction team was basically a last resort option for bringing him into the courtroom.
 

 THE BAILIFF: Yes, ma’am. He was told that if he did not cooperate and do as instructed that the extraction team would be called, and he would be brought in in a chair.
 

 THE COURT: And was he given every opportunity to come into the courtroom voluntarily?
 

 THE BAILIFF: Yes, ma’am THE COURT: And is the extraction team a last resort option with the Sheriffs Office?
 

 THE BAILIFF: Yes, ma’am.
 

 THE COURT: And at any time did Mr. Smith indicate to you that he would come into the courtroom voluntarily? THE BAILIFF: No, ma’am.
 

 MR. SMITH: Objection, your Honor. And for the record that bailiff that’s right next to the court reporter, I told her to tell them to bring me my wheelchair and my suit. And she went out there and told them that. And ask her for the record did I say that.
 

 THE COURT: And, Mr. Smith, do you—
 

 MR. SMITH: [To a bailiff] Excuse me. Did I ask you, like, to tell them to bring my wheelchair and my suit?
 

 THE COURT: Mr. Smith, I’m talking to you right now.
 

 MR. SMITH: Well, why would somebody want to come—
 

 THE COURT: Listen to my question. MR. SMITH: All right.
 

 THE COURT: Do you want to continue to proceed with your own representation like yesterday or do you want Mr. Lan-drigan to finish the trial?
 

 MR. SMITH: I would like to proceed with my own representation.
 

 THE COURT: Okay.
 

 
 *1085
 
 MR. SMITH: I’ve been asking you, like, to dismiss him off my case, period!
 
 [2]
 

 THE COURT: Okay. Well, I won’t change anything with respect to that.
 

 MR. SMITH: I’m putting on the record the reason I’m saying that you biased because, like, he ain’t conduct no type of investigation on my case. He ain’t take depositions, and he brung me in here to come to trial without doing like no type of investigation, taking depositions, no type of work on the case. And I told you that, and then you told me that I would have to proceed with trial. And right before the jury came in here, like, you all gave me the paperwork to represent myself. Like, I don’t see how could that even be fair, like, any — even—even a regular lawyer that get appointed to a case, like, would probably get some time to prepare, like, even — even if it was just for a brief recess. Like, you all handed me the paperwork right before the jury came in.
 

 THE COURT: All right. Mr. Smith, it’s clear that you’re really not cooperating today.
 

 MR. SMITH: I’m willing to cooperate. THE COURT: And—
 

 MR. SMITH: I’m stating that for the record.
 

 THE COURT: Mr. Smith, you also have the option of not being present in the courtroom for the remainder of your trial. Would you like to be in the back while we wrap up your trial?
 

 MR. SMITH: No, ma’am.
 

 THE COURT: Okay. Then I expect you to address the Court when you’re asked and to stop talking when you’re asked and to conduct yourself appropriately when the jury comes in.
 

 And the procedure with the team is that when we’re ready to have the jury brought in, they will be excused from the courtroom?
 

 THE BAILIFF: Yes, ma’am.
 

 THE COURT: Okay. Yeah. Ms. Cardenas, are you ready to proceed? MS. CARDENAS: Yes, your Honor. THE COURT: And do we have our jury here?
 

 THE BAILIFF: Yes, Judge.
 

 THE COURT: Okay.
 

 MR. SMITH: Before you bring them in, may I put my [street] clothes on before you bring the jury in?
 

 THE COURT: And what is the policy on the chair situation?
 

 THE BAILIFF: Once he’s placed in the chair out here, he is as is. He stays just like he is.
 

 THE COURT: And that’s for what period of time?
 

 THE BAILIFF: Well, it’s up to four hours but it’s up to, you know, however he behaves.
 

 THE COURT: Okay. And I understand that Mr. Smith’s clothes from yesterday were here in the back for him to put on on his own today to start the trial, is that correct?
 

 THE BAILIFF: Yes, your Honor.
 

 THE COURT: And he refused to do that?
 

 THE BAILIFF: Yes, your Honor, He refused to get dressed.
 

 MR. SMITH: I’m objecting to that. I just said that I’d get dressed. And I said that the bailiff that’s standing over there by the door I had asked her, like, to bring the wheelchair and get my clothes. She told them that, and they
 
 *1086
 
 called the people anyway. Then they was out there joking around laughing at me and stuff like that like it’s a game. And for the record I’m telling you that I’m willing to cooperate. And the lieutenant just said that it depends on how I act, can I come out the chair or not. And I’m saying that I am going to cooperate, like, and with whatever you say. Speak whenever, like, you speak to me and whenever you tell me to be quiet, I’m going to be quiet.
 

 THE COURT: Well, Mr. Smith, the problem that I’m having right now is that yesterday we spent a lot of time getting clothes for you for trial. We— you came in. You weren’t dressed for court. The Public Defender went to get clothes for you. They weren’t right. They didn’t fit. You were sent back to the jail to get the clothes you had for when we were at trial here last time. And those weren’t suitable. The Public Defender then went to get other clothes. They did fit. So we spent a great deal of time delaying this trial. We finally got clothes for you that looked good. You had shoes to go with it. You had the belt. That was another trip to make the pants fit right. All of those clothes were here for you today.
 

 And when you got back, you refused to put those clothes on. You refused to put any shoes on. You refused to get up off the floor of the holding cell. You refused to come into the courtroom. So you have done nothing but show a lack of cooperation, Mr. Smith, which is unfortunately why you are in the position you are in right now.
 

 And now the problem is the Sheriff has a policy about that chair. It’s four hours in it once you’re in it. And I don’t have any reason to believe you now when you tell me that you will cooperate now if I just let you put your clothes on when you have had every opportunity and every — every provision that could have been made for you has been made for you with respect to clothes, medical care, and everything else, Mr. Smith.
 

 So unfortunately this is the end of the line. And this is how we will proceed for the remainder of our trial. And so, corporal, if you — we—will bring the jury in as soon as the [extraction] team is out of the courtroom.
 

 THE BAILIFF: Yes, ma’am, your Hon- or.
 

 THE COURT: Thank you.
 

 MR. SMITH: I’m objecting to what you said, and I guess that will be an issue for appeal, like, where I’m pretty sure they see me like this, that they going to already, like, find me guilty.
 

 THE COURT: Mr. Landrigan, could you make sure Mr. Smith can—
 

 COURT REPORTER: One at a time. THE COURT: Can you make sure the copy of the jury instructions are close enough to him—
 

 MR. LANDRIGAN: Yes, ma’am.
 

 THE COURT: —that he can see them? MR. LANDRIGAN: Yes, ma’am.
 

 THE COURT: And when we get to the point where we go through the jury instructions, if you could go through the pages for him.
 

 MR. LANDRIGAN: Yes, ma’am.
 

 THE COURT: We won’t do that now so that we can get started with our jury.
 

 MR. LANDRIGAN: Okay.
 

 Mr. Smith argues that the trial judge abused her discretion in refusing to release him from the chair and dress in street clothes in order to conduct his casein-chief before the jury and appear normal. We agree because a defendant has a right to be free of restraints before the jury at trial. As the Supreme Court stated in
 
 *1087
 

 Illinois v. Allen,
 
 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970):
 

 Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment’s purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury’s feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.
 

 While Mr. Smith was not gagged, his arms and legs were shackled to such an extent that standby counsel had to turn the pages of the jury instructions so that he could participate in the jury charge conference. Nor could he stand at the podium to address witnesses, the jury in closing, or the court when necessary. A defendant’s right to be free of restraints during a trial is not absolute. But in this instance the judge abused her discretion by imposing such restraints the second day of trial, especially in light of Mr. Smith’s repeated avowals that he would behave in court, as he had done the previous day.
 
 Cf. Elledge v. State,
 
 408 So.2d 1021, 1022-23 (Fla.1981) (finding no abuse of discretion in the requirement that the defendant appear before the sentencing jury in a capital murder case in leg irons because he was not before the jury as a presumed innocent man, having been convicted of three murders, had threatened to attack his bailiff, and through his confession had proven himself a “man of his word when violence was threatened”).
 

 Mr. Smith had shown to a great degree that he was uncooperative with jail personnel, but once in the courtroom he was not unruly, threatening, or violent, and none of his actions had been disruptive of the proceedings in the courtroom or its security. We agree with Mr. Smith’s argument that the judge should not have allowed jail policy to dictate procedure in her courtroom where he was not engaging in violent or disruptive behavior while in the courtroom and there was no indication that he would do so.
 

 In deciding whether to physically restrain a defendant and what method to use, the court must balance its obligation to maintain courtroom safety against the risk “that the security measures may impair the defendant’s presumption of innocence;” a court may order physical restraints only if it finds them to be necessary to maintain the security of the courtroom.
 
 Diaz [v. State],
 
 513 So.2d [1045,] 1046 [(Fla. 1987) ]. The court may not blindly defer to security measures established by the sheriff or other official performing security functions.
 
 See McCoy v. State,
 
 503 So.2d 371 (Fla. 5th DCA 1987).
 

 Jackson v. State,
 
 698 So.2d 1299, 1302 (Fla. 4th DCA 1997). The use of physical restraints on a defendant is necessary “where there is a history or threat of escape, or a demonstrated propensity for violence.”
 
 Id.
 
 at 1303 (collecting cases as exemplars). Mr. Smith does not fit into this category.
 

 The Fourth District in
 
 Jackson
 
 found error in the shackling of a defense witness who was the defendant’s cellmate. The cellmate was testifying in Mr. Jackson’s trial for two counts of battery on a law enforcement officer for allegedly striking two deputies while incarcerated. The district court used the same standard in re
 
 *1088
 
 viewing the shackling of a defense witness as if the defendant himself had been shackled.
 
 Id.
 
 at 1301. It found error and then conducted a harmless error analysis. The district court found that under the circumstances of Mr. Jackson’s case, because the incident happened in a correctional facility, it was not “unreasonable to assume that the jury would naturally expect that when inmates appear in court, either as parties or witnesses, adequate security measures would be taken.”
 
 Id.
 
 at 1304 (quoting
 
 Harrell v. Israel,
 
 672 F.2d 632, 638 (7th Cir.1982)).
 

 Jackson
 
 is factually distinguishable, and we decline to conduct a similar harmless error analysis. We conclude the trial judge abused her discretion in Mr. Smith’s case and this merits reversal. “[A] decision to use restraints will be reversed only on a showing of abuse.”
 
 England v. State,
 
 940 So.2d 389, 404 (Fla.2006). Mr. Smith did not present a disruptive presence in the courtroom, did not display violent behavior at any time either in the courtroom or outside of it, and did not physically or verbally threaten anyone at any time. Because the trial judge abused her discretion, the matter must be remanded for a new trial.
 

 Although our decision to reverse for a new trial based on issue two moots issues one and three, we address them briefly because they may arise again on retrial.
 

 Mr. Smith argues in issue one that the trial judge erred in precluding him from calling any witnesses (1) because he had not complied with the rules of discovery in listing witnesses and (2) without first conducting a hearing as required under
 
 Richardson v. State,
 
 246 So.2d 771 (Fla.1971). Mr. Smith’s pro se situation was complicated because his assistant public defender had not submitted a list of witnesses whom Mr. Smith could call for his defense after he decided to represent himself on the morning of trial. Were we not reversing for a new trial, this issue might merit some discussion because the State admitted that it was not prejudiced by the defense’s failure to list any witnesses. Moreover, the record suggests on its face a potential for an ineffective assistance claim. Because we are reversing for a new trial, it might behoove Mr. Smith on remand to file a witness list so that he would be in compliance with the rules and could have a say whether and when a witness may be released from subpoena.
 

 Finally, in issue three, Mr. Smith complains that the trial judge did not renew the offer of assistance of counsel to him, a pro se defendant, at sentencing. Not renewing the offer of counsel at sentencing to a pro se defendant is per se reversible error.
 
 See Jackson v. State,
 
 983 So.2d 562, 575 (Fla.2008) (‘We agree ... that a complete denial of counsel at resen-tencing ... is fundamental error.”).
 

 Because the trial judge abused her discretion on the second day of Mr. Smith’s trial, we reverse and remand for a new trial.
 

 KELLY and WALLACE, JJ., Concur.
 

 [1]
 

 1. Mr. Landrigan was Mr. Smith’s former assistant public defender. On the first day of trial, when Mr. Smith expressed dissatisfaction with his counsel’s preparation and dismissed him, choosing to represent himself, the judge had ordered counsel to remain in the courtroom as standby counsel.
 

 [2]
 

 2. It is apparent to us from this exchange and other parts of the trial transcript that Mr. Smith did not understand the role of “standby counsel” who can only "stand by” and not be involved in his defense except as a spectator.