742 So.2d 447 (1999)
Misti EHRLICH, Appellant,
v.
STATE of Florida, Appellee.
No. 98-1894.
District Court of Appeal of Florida, Fourth District.
September 17, 1999.
*448 Carey Haughwout of Tierney & Haughwout, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Robert R. Wheeler and Marrett Hanna, Assistant Attorney Generals, West Palm Beach, for appellee.
STONE, J.
We affirm Ehrlich's conviction and sentence on two counts of second-degree murder and two counts of attempted second-degree murder, lesser-included offenses of the originally charged crimes of first-degree and attempted first-degree murder. The evidence of her aiding and abetting was sufficient to support the convictions.
Ehrlich is the girlfriend of Robert Pransky, who at the time of these offenses was in jail awaiting trial on the charge of trafficking in cocaine. Pransky was arrested on that charge along with Brian Goodine, one of the victims in this case. Pransky remained in custody, but Goodine was out on bail. Prior to Pransky's trial, Ehrlich enlisted Robert Jackson and Miguel Garcia to keep Goodine from testifying against Pransky. She did not take part in the actual shooting, but was an active participant in the crime.
Garcia testified on behalf of the state. He had been involved with Ehrlich for many years, although they were no longer in a romantic relationship. Garcia, Ehrlich, and the other perpetrator, Robert Jackson, had previously worked together at a local restaurant.
Garcia testified that on the evening of the shootings, Ehrlich and Jackson came to his house in her automobile and invited him to join them. They drove to Goodine's house. Ehrlich told them that they were going to "Gooney's house so Jackson could go talk to him in order for him not to testify against Robert Pransky."
Ehrlich drove to the house and she, Jackson, and Garcia's girlfriend, Deanna, spoke with Goodine, but Garcia remained in the car. When they returned, Ehrlich said that they had to come back because "she knew Goodine is going to continue to *449 testify... he was high on crack, he had a pistol, he had a gun... We had to come back [sic] make sure he won't testify." Ehrlich also said that "if Bob... Pransky... don't like the fact he is going to continue to snitch he would want him dead." Jackson then stated that if he was going to come back he wanted a gun. Ehrlich replied, "well, I will give you Bobby's gun," referring to Pransky. Ehrlich then told them that they needed to buy new bullets because the shells in the gun had Pransky's fingerprints on them, and she did not want the bullets to be traced back to him.
The group went to Sports Authority where Jackson purchased ammunition for the gun. Garcia was close by during the purchase, but Ehrlich and Deanna went to another area of the store. The next stop was Riviera Beach where Deanna was dropped off and Ehrlich told Garcia to "grab a shotgun and she will explain later what is going on." Garcia complied. Ehrlich told Garcia, as a favor, to "go with Jackson, back him up, make sure don't [sic] nothing happen, if anything happen in the house drag him out. If he were to get jumped or if any shooting happens, back him up."
They headed back to Goodine's house and on the way, Ehrlich reiterated that if Gooney was still going to testify against him, Pransky wanted him dead. Jackson said that he wanted to confirm directly from Pransky's mouth as to "what he wanted done...if he wanted his cousin shot, killed, if he wanted to continue to testify or if he wanted just wanted him to scare, ... just to talk to him, so he wouldn't testify, going against him in Court." Consequently, they stopped at a convenience store where Ehrlich made a phone call; Garcia heard her tell the person on the line that if Pransky called to call her on a three way number and gave the person the number. Shortly afterward, Ehrlich told Jackson that Pransky wanted to talk to him; Jackson went to the phone and spoke to Pransky. When Ehrlich and Jackson came back to the car, Jackson said "we got the okay."
Ehrlich then told Jackson and Garcia to steal a car because she did not want Pransky's (her) car being used, and drove them to another location where they stole a car. They proceeded back to Goodine's house and Ehrlich left them and went to the nearby house of Michelle Price.
Jackson and Garcia returned to Goodine's house; they parked and left the motor running. They got the weapons out of the car. Jackson knocked on the door, then he knocked the jalousies out. It was dark. Garcia heard three gun shots and he fired his shotgun in the direction of the shots. He kept firing his shotgun. Jackson ran into the house and started firing. They went through the house firing many more shots and eventually ran out with shots firing in return. The gunfire resulted in two deaths, including that of a two year old child. Goodine was shot at and had bullet holes in his shirt, but was not injured.
After the shooting, Jackson and Garcia returned to the car and immediately drove to Price's house, where Ehrlich was waiting. Ehrlich had Bobby (Pransky) on the phone, which she gave to Jackson; he then turned the phone over to Garcia. Bobby asked what happened and Garcia told him. Price then took Garcia and Jackson home because Ehrlich again said she did not want her car involved.
Garcia testified that it was never his intention to shoot anyone, and that he and Jackson never discussed "planning [any]thing out." He said that his role was to protect Jackson who was going to talk to Goodine. However, Garcia also acknowledged that he knew his role was to make sure Goodine would not testify against Pransky.
A neighbor testified that the whole Goodine house was lit up with gunfire and people were running back and forth. When Goodine came out, he told the witness that "he didn't think they were going *450 to do it" and showed Blackburn the holes in his shirt where they had shot and missed him.
Ehrlich's friend testified that they were sitting on the porch and heard the gunshots. She asked Ehrlich, "Is this them?" and Ehrlich said, "yes." She overheard Garcia tell Bobby on the phone that the job is done.
Ehrlich's taped statement was admitted into evidence. In it she admitted that she had originally lied about who had accompanied her to Goodine's house. Ehrlich admitted that she took Jackson and Garcia to steal the car that they drove to Goodine's house. She asserts that she had gone to Goodine's house to remind him about court. She did not want to go by herself so she took Jackson and Jackson did not want to go by himself so they picked up Garcia.
The detective confronted Ehrlich with some inconsistencies in her statements. Originally, Ehrlich had denied going to Sports Authority at all; however, she eventually admitted that she went to Sports Authority with Jackson but only to look at shoes and denied knowing anything about ammunition. The detective asked Ehrlich about the 9mm pistol that was used; she admitted that Pransky had a pistol that was kept in her house in the bedroom and stated that Jackson must have taken it when she went to her mother's room.
To sustain a conviction as a principal for a crime committed by another, the state must prove that the defendant "intend[ed] that the crime be committed and [did] some act to assist the other person in actually committing the crime." Staten v. State, 519 So.2d 622 (Fla.1988). As stated in Arroyo v. State, 705 So.2d 54 (Fla. 4th DCA 1997),
If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if she had done all the things the other person did if (1) the defendant had a conscious intent that the criminal act be done and (2) the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person... to actually commit the crime.
Id. at 56 (quoting Fla. Std. Jury Instr. (Crim.) 3.01, p. 32a).
Where the state's case is circumstantial, a special standard of review applies, as stated in State v. Law, 559 So.2d 187 (Fla.1989),
A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.
... That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
Id. at 188-89 (citations omitted). In Orme v. State, 677 So.2d 258 (Fla.1996), the supreme court quoted Law and elaborated, stating
[T]he sole function of the trial court on motion for directed verdict in a circumstantial-evidence case is to determine whether there is prima facie inconsistency between (a) the evidence, viewed in the light most favorable to the State and (b) the defense theory or theories. If there is such inconsistency, then the question is for the finder of fact to resolve. The trial court's finding in this regard will be reserved on appeal only where unsupported by competent substantial evidence.
Id. at 262.
Proof of mental intent is seldom accomplished by direct evidence; consequently, the absence of direct proof on the question of the defendant's mental intent should rarely, if ever, result in a judgment *451 of acquittal. See King v. State, 545 So.2d 375, 377 (Fla. 4th DCA 1989); Brewer v. State, 413 So.2d 1217 (Fla. 5th DCA 1982).
Here, as required to prove Ehrlich's role as principal, the state presented direct and circumstantial evidence as to Ehrlich's conscious intent that the crime be committed. Ehrlich's statements to Garcia that they had to return to Goodine's because "she knew Goodine is going to continue to testify...he had a gun... We had to come back [sic] make sure he won't testify," and, further, that Pransky would want Goodine dead if he was going to snitch and testify against him, along with her numerous contacts with Pransky to obtain the "okay" and report on the results of the crime, clearly showed that Ehrlich, acting on behalf of her boyfriend, intended to use violence to ensure that Goodine would not testify against Pransky. Ehrlich's intent was also established circumstantially by her direction that both Garcia and Jackson secure weapons for commission of the crime, and her attempts to distance herself by directing Garcia and Jackson to purchase new ammunition and by actively avoiding use of her car in the crime. The evidence of intent, viewed in the light most favorable to the state, established a "prima facie inconsistency" between the defense and the state theories; the former being that Ehrlich merely wished to remind Goodine to come to court to testify on Pransky's behalf; the latter that Ehrlich wanted to ensure Goodine's silence through violent means. Ehrlich's intent that Jackson or Garcia murder or do serious bodily harm to Goodine could reasonably be inferred regardless of Garcia's stated intent. In fact, the reasonable inference is that she and Pransky masterminded the entire crime. The resolution of the inconsistency between the state and defense theories was properly a question for the jury. See Orme; King.
The state further established Ehrlich's active encouragement and participation in the planning and steps leading to the commission of the crimes, thus, satisfying the second prong required to prove Ehrlich's guilt as a principal to the crime, by proof that Ehrlich explained to both Garcia and Jackson the reason for Goodine's silence, proof that Ehrlich told Garcia to bring his shotgun and went with him to retrieve it; proof that Ehrlich told Jackson he could use Pransky's gun and accompanied him to Sports Authority to buy new ammunition; proof that Ehrlich directed Garcia and Jackson to steal a car to accomplish the crime and drove them to another location to do so; proof that Ehrlich waited at a nearby location while the crime was committed; and, finally, proof that she reported the results to Pransky.
As in Staten, 519 So.2d at 624, where there was direct testimony that the defendant was present on numerous occasions when the proposed robbery was planned, further discussion as the group drove to the scene to execute the plan and the defendant waited in the car across the street, we find that "from this combination of factors, the jury could legitimately infer that [the defendant] was a participant in the crime." Id.
As to all other issues raised, we also find no reversible error or abuse of discretion. Therefore, the judgment and sentence are affirmed.
DELL and GROSS, JJ., concur.