PER CURIAM.
Mark A. Westbrooks appeals his convictions for manslaughter (a lesser-included of felony murder), two counts of armed robbery, and four counts of attempted armed robbery. On appeal, Westbrooks claims that the trial court erred in denying his motion for judgment of acquittal because the State did not rebut his hypothesis of innocence that he was not involved in the robbery. We affirm his convictions for the reasons expressed below.

I. Facts

At trial, the State proceeded on the theory that on November 11, 2009, West-brooks and two other men drove to the Carver City area of Tampa to rob a group of men playing cards outside of a house. The men playing cards had been warned that a robbery was about to take place in Carver City, but they did not take the warning seriously. The men had witnessed a car drive by about twenty minutes prior to the incident. When the car returned, two masked perpetrators exited the car with guns in their hands. One of the perpetrators shot into the air and ordered everyone to the ground, and some of the men playing cards ran into a nearby house. One of the perpetrators robbed two of the men who remained outside, taking their jewelry, wallets, money, and phones. Another man tried to flee, but a second perpetrator shot him in the back, killing him. The perpetrators then returned to their car and drove away.
Greshawnta Hornsby, Westbrooks’ ex-girlfriénd, testified that she was with Westbrooks on the evening of November 11, 2009. Westbrooks received a phone call when Hornsby was sitting in his car with him around 7:30 or 7:40 that evening. Hornsby testified to the following: “He said, ‘A lick?’ And then kind of paused and ‘Carver City’ and said ‘All right.’” He then hung up the phone. The phone records confirmed that Westbrooks received a call from Chris Lemons at 7:40 that lasted forty-seven seconds and that Westbrooks received another call from Lemons at 7:41. Hornsby identified a photograph in evidence as being that of Westbrooks’ car. It was the same car that *876 she was sitting in when he received the phone call about a “lick” in Carver City. Later, after Hornsby learned about the robberies and shooting in Carver City, she asked Westbrooks about it and he told her he had been in St. Petersburg with his car.
Several witnesses to the offenses, including victims, testified at trial and identified the car that the perpetrators drove. Brenda Green owned the home outside which the incident occurred. She testified that she heard gun shots around 8:30 in the evening and that the car driven by the perpetrators was louder than a normal car. She called 911.
Isaac Anderson, one of the victims, testified that the car drove by a first time and that he “heard the pipes go by.” Then, about twenty minutes later, the car drove by again, but this time it stopped and the occupants got out. It was a greenish blue, four-door car, and he noticed a little dent on the back. When the occupants exited the car, the interior light came on and Anderson was able to tell that the interior was gray. The windows were darkly tinted. He identified the photos in evidence, which were photos of Westbrooks’ car, as depicting the car involved in the offenses. The pipes on the car sounded like a deep roar.
Reginald Bass, another victim, testified that he heard a car pass by with pipes. It looked like a police car, but he realized it was not because he heard the pipes. It was either a Crown Victoria or a Mercury. It was the car that returned for the shooting. It was a four-door car that had a dent on the passenger side door towards the middle.
Randy Cochran testified that the car that returned for the offenses had loud “flow masters on it,” which are dual pipes that make the “car faster, sound better.”
Joseph Green testified that he was on his porch when he saw a car at the high school fifty to sixty feet away and that the car looked like a Mercury that was dark green in color. “It sounded like it had a big engine in it like it had pipes on it.” A “black dude” with “long dreadlocks” got out, and he opened the trunk and put a t-shirt over the license tag. Two other people were in the car. The car drove by Green’s house and turned. Thirty seconds later, he heard about six gunshots. He heard the car again, and he ran to his yard and saw the same car turn onto another street. He picked the car out of photographs shown to him, and he was able to identify it by a dent it had on the side. He paid attention to the car because “[s]ome-thing ain’t look right to me.” The car had tinted windows.
Leslie Allen, another victim, testified that the car that stopped before the shooting was a “bluish, greenish Mercury Grand Marquis.” He identified the car in the photo as being similar to the one at the shooting. It had tinted windows and no hub caps. He noticed the pipes as it was leaving and that it sounded like the same pipes he had heard earlier that evening when the car had driven by the first time.
Detective Camp identified the photos in evidence as depicting the Mercury Grand Marquis belonging to Westbrooks. It had a gray interior. Detective Camp also testified that he conducted a taped interview with Westbrooks about a week after the incident. In that conversation, West-brooks told Detective Camp that he was with Chris Lemons and Chris Toombs in Tampa on the night of the shooting. He admitted that he had previously told Hornsby that his car was in St. Petersburg because he did not want her to bother him. He also denied to Detective Camp that anybody had access to his car that night other than him.
*877 The State presented detailed evidence of phone calls made that night between West-brooks, Toombs, Lemons, and Hornsby. The State introduced phone records and maps into evidence which showed the location of the towers from which all the calls were placed and received. The phone calls also showed that the group was in contact with a Matthew Grier, a person who several witnesses said was present at the location in Carver City for only a few minutes prior to the incident. Specifically, the records showed that Westbrooks was in contact with Lemons at 7:40 and 7:41. The records also showed that Grier called Toombs around 7:26 p.m. and that Toombs called Grier at 7:41. These early phone calls placed Westbrooks, Lemons, and Toombs in the area of Tampa where Toombs and Lemons lived. Grier and Toombs continued to make phone contact. Between 8:19 and 8:31, Grier made several phone calls to Toombs. The location of the cell tower indicated that at that point in time, Toombs was within six blocks of where the shooting occurred. Approximately twenty minutes later, Toombs called Grier again twice at 8:50, from an area with a cell tower seven or eight miles away, back in the area where Toombs and Lemons lived. Later phone calls showed that Toombs, Westbrooks, and Lemons remained back on their side of town. Then, at 2:11 a.m., a call was placed from Reginald Bass’s stolen cell phone to Lemons but Lemons did not answer. Then, at 2:12, a call was placed from Leslie Allen’s stolen cell phone to Lemons but Lemons did not answer. At 2:15, Lemons called Toombs. At 2:16, Lemons called Grier. At 2:21, Toombs called Grier. At 2:28, Lemons called Westbrooks. In sum, the phone activity clearly showed that West-brooks, Lemons, and Toombs were in contact with each other much of the night and that between 8:00 and 9:00, the hour surrounding the robbery, there was significant phone activity between Toombs and Grier which placed Toombs within blocks of the Carver City incident.
At the close of the State’s case, West-brooks moved for a judgment of acquittal, arguing that the circumstantial evidence was insufficient to sustain convictions for the offenses. The trial court denied the motion, and the jury found Westbrooks guilty of manslaughter (a lesser-included offense of felony murder) and as charged on the robbery and attempted robbery counts. He was sentenced to thirty years in prison on the armed robberies to be followed by ten years’ probation and to 304.5 months in prison on the attempted armed robberies and the manslaughter, all to run concurrently.

II. Analysis

Generally, a motion for judgment of acquittal should be denied “[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt.” Pagan v. State, 830 So.2d 792, 803 (Fla.2002). However, in cases in which the evidence is “wholly circumstantial,” a special standard of review applies: “the evidence must also exclude the defendant’s reasonable hypothesis of innocence.” Id,.; see also Mosley v. State, 46 So.3d 510, 526 (Fla.2009) (“If the State presents both direct and circumstantial evidence, courts do not apply the special standard of review applicable to circumstantial evidence cases.” (citing Pagan, 830 So.2d at 803)). “Under the circumstantial evidence standard, when there is an inconsistency between the defendant’s theory of innocence and the evidence, when viewed in a light most favorable to the State, the question is one for the finder of fact to resolve and the motion for judgment of acquittal must be denied.” Durousseau v. State, 55 So.3d *878 543, 557 (Fla.2010). “‘The state is not required to “rebut conclusively every possible variation” of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the [d]efendant’s theory of events.’ ” Id. (quoting State v. Law, 559 So.2d 187, 189 (Fla.1989)). The State is not required to rebut a hypothesis of innocence that is unreasonable. See Henderson v. State, 679 So.2d 805, 806 (Fla. 3d DCA 1996) (“While we must agree with [appellant] that the State was required to provide evidence inconsistent with any reasonable hypothesis of innocence, we emphasize that the State was not required to exclude any unreasonable hypothesis.”).
In this case, there was direct evidence that Westbrooks was told of a robbery before it was committed, thus suggesting his participation in the robberies, but there was no direct evidence that Westbrooks participated in the robberies. See Singleton v. State, 105 So.3d 542, 544 (Fla. 2d DCA 2012) (holding that direct evidence of defendant’s DNA found at the scene was “direct evidence merely of a circumstance that suggested his participation” in the burglary and theft but was “not direct evidence of [his] participation in the burglary’); see also Charles W. Ehrhardt, Ehrhardt’s Florida Evidence § 401.1 (2013 ed.) (“Direct evidence is evidence which requires only the inference that what the witness said is true to prove a material fact; e.g., T saw A shoot B’ is direct evidence that A shot B. Circumstantial evidence is evidence which involves an additional inference to prove the material fact; e.g., T saw A flee the scene’ is circumstantial evidence of A’s guilt and direct evidence of flight.”). Therefore, this court must apply the special standard applicable to wholly circumstantial evidence cases. See Kocaker v. State, 119 So.3d 1214, 1225 (Fla.2013) (applying special circumstantial evidence standard in a case in which the State “failed to present direct evidence that it was [defendant] who killed [the victim]”); Law, 559 So.2d at 188 (applying “special standard of review ... [w]here the only proof of guilt is circumstantial”); Singleton, 105 So.3d at 544 (applying circumstantial evidence standard where there was no direct evidence of defendant’s participation in the offenses).
In order to convict Westbrooks as a principal, the State was required to prove (1) that he intended for the offenses to be committed and (2) that he assisted in the commission of the offenses. See McBride v. State, 7 So.3d 1146, 1148 (Fla. 2d DCA 2009). Hornsby’s testimony established that Westbrooks was told about a robbery in Carver City before it happened. Specifically, Westbrooks’ statements during a phone call indicated that he was asked about a robbery in Carver City and that he responded, “all right.” Numerous witnesses identified West-brooks’ car as the one involved in the robbery, and Westbrooks admitted that he was the only one in possession of his car on the night of the offenses. Westbrooks also admitted that he was with Toombs and Lemons that night. The cell phone records placed Toombs within six blocks of the incident around the time of the incident and showed that Toombs was in constant phone contact with a person, Grier, who had left the scene of the robbery minutes before it occurred. The evidence showed that Westbrooks knew that a robbery was being planned and that he committed acts in furtherance of the robbery. Cf. id. at 1149 (holding that McBride’s presence at and flight from the scene was insufficient to sustain his conviction where the State “failed to present any evidence that established McBride’s intent that the *879 victim be shot or that he committed an act in furtherance of the shooting”).
Westbrooks’ hypothesis of innocence was one of mistaken identity, i.e., that he was not involved in the incident. But the State presented evidence that was inconsistent with his theory of events. Numerous eyewitnesses identified Westbrooks’ car as the one driven by the perpetrators; three people testified that the car they saw that evening had a dent in it, which proved to match a dent in Westbrooks’ car, and all of the witnesses testified that the car had loud pipes, which also proved to match Westbrooks’ car. The State also presented Westbrooks’ statement to Detective Camp that Westbrooks was the only one with access to his car that night.
Further, the State presented other evidence that Westbrooks was in the area of Carver City at the time of the incident. The State introduced a taped conversation in which Westbrooks told Detective Camp that he had been gambling with several people that evening, including Lemons and Toombs. He was with both Lemons and Toombs when Hornsby called him to tell him that a shooting had occurred in Carver City. The cell phone records also placed Toombs within blocks of the shooting at the time of the shooting, and both Lemons and Westbrooks did not use their cell phones for approximately an hour surrounding the shooting. During that hour, Toombs was in constant contact with Grier, who had been at the location of the shooting just prior to the shooting. Later in the evening and again early in the morning, Westbrooks, Lemons, and Toombs called each other. And early in the morning, phone calls were placed from the stolen cell phones to Lemons, and both Lemons and Toombs called Grier.
Neither Westbrooks nor the State provide any case law that is directly on point or helpful to the factual scenario in this case. But State v. Sims, 110 So.3d 118 (Fla. 1st DCA 2013), provides some guidance. In Sims, the First District affirmed the trial court’s granting of a postverdict motion for judgment of acquittal. Id. at 114. Sims was convicted of charges stemming from a shooting incident at a gas station. Sims and his friend, Webb, had been involved in a fight with five men at a park earlier that day. Id. at 114-15. At the park, Sims had been driving his car, and Webb was riding with him. About forty-five minutes later, the five men encountered Webb at a convenience store. Id. at 115. He was in the backseat of a car outside the store. As the five men left, the car in which Webb was riding followed them to a gas station, where Webb fired a gun from the backseat window.
The First District held that the State did not meet its burden under the special circumstantial evidence standard in proving Sims’ guilt and that a finding of his guilt “could be sustained only by stacking several inferences one on another.” Id. at 116.[1] The court concluded that no forensic evidence or eyewitness accounts connected Sims’ car to the shooting. While two of the victims indicated that the car was similar to Sims’ car (a dark blue, four-door Pontiac G6), another bystander described it as a black, two-door car. Id. at 115. Even if Sims’ car was involved, there was no direct or circumstantial evidence that he was driving his car. Id. at 116. And even if Sims’ had been driving, there was no evidence that Sims knew that Webb intended to fire a gun from the back seat.
*880 This case is distinguishable from Sims for several reasons. In this case, the eyewitnesses were able to identify West-brooks’ car as the one seen before and during the shooting. There were some inconsistencies in the description of the car, but most of the descriptions specifically matched Westbrooks’ car. In addition, there was evidence that Westbrooks was either driving his car or riding in his car during the shooting; Westbrooks admitted that he was with his car most of the evening and that nobody else had access to his car because when he was not with his car for a short period of time, he still had the keys. Furthermore, there was direct evidence that Westbrooks was told about a robbery in Carver City before it happened and that he left Hornsby’s house immediately after that. Westbrooks’ participation and intent to participate in the robbery could be inferred from all of the circumstances. Here, the circumstantial evidence could lead a jury “ ‘to a reasonable and moral certainty’ ” that Westbrooks participated in the offenses. See Cox v. State, 555 So.2d 352 (Fla.1989) (quoting Hall v. State, 90 Fla. 719, 107 So. 246, 247 (1925)).
This court recently reversed a felony murder conviction in Rocker v. State, 122 So.3d 898, 903-905 (Fla. 2d DCA 2013), holding that the circumstantial evidence presented by the State was not inconsistent with Rocker’s hypothesis of innocence that he “set up a drug transaction without prior knowledge that [his codefendant] intended to take advantage of the situation to rob the victim.”[2] The facts in this case are distinguishable from those in Rocker. The Rocker case turned on the evidence of Rocker’s intent. Id. at 903-05. Here, the State provided clear evidence of West-brooks’ intent. A witness testified that in a phone call with his friend Lemons, West-brooks mentioned a “lick,” or a robbery, in Carver City. Also, Westbrooks admitted being with or in control of his car all night, and the State presented evidence that Westbrooks’ car was involved in the incident. There was no other explanation for Westbrooks’ car being in Carver City that night. Cf. Rocker, 122 So.3d at 904 (concluding that Rocker’s actions on the night of the murder were “just as consistent with the theory that he was participating in a drug transaction as [they were] with the theory that he was participating in a robbery”). The State presented evidence of intent and participation that was inconsistent with Westbrooks’ theory that he was not involved in the incident. Cf. Pack v. State, 381 So.2d 1199 (Fla. 2d DCA 1980) (holding that circumstantial evidence that defendant drove the car and fled the scene after his brother committed robbery was insufficient to sustain defendant’s conviction absent other evidence of defendant’s intent to aid in the robbery).
Because the State presented circumstantial evidence in this case that was inconsistent with Westbrooks’ hypothesis of innocence, we affirm his convictions.
Affirmed.
NORTHCUTT, J., Concurs specially with an opinion.
MORRIS, J., Concurs with an opinion in which BLACK, J., Concurs.

. In a dissenting opinion in Sims, Judge Thomas concluded that the State presented sufficient circumstantial evidence to convict Sims. 110 So.3d at 117 (Thomas, J., dissenting).

. Rocker was a split decision with a vigorous dissent by Judge Villanti, in which he opined that the State presented evidence that was "inconsistent with Rocker’s hypothesis of innocence which would then allow the jury to infer his intent to commit the crime.” 122 So.3d at 911 (Villanti, J., dissenting). The State sought discretionary review of this court's Rocker decision in the Florida Supreme Court. State v. Rocker, SC 13-1975. On October 22, 2013, the supreme court granted the State's motion to stay further proceedings as well as the enforcement of this court's mandate of the Rocker decision.