NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

GEORGE O. SHRADER,　　　　　　　　)
DOC #101103,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Appellant,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　Case No. 2D13-2712
　　　　　　　　　　　　　　　　　　　)
STATE OF FLORIDA,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Appellee.　　　　　　　　　)
_____)

Opinion filed September 7, 2016.

Appeal from the Circuit Court for
Hillsborough County; Emmett L.
Battles, Judge.

Howard L. Dimmig, II, Public Defender,
and Richard J. D'Amico, Special
Assistant Public Defender, Bartow,
for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Wendy Buffington,
Assistant Attorney General, Tampa,
for Appellee.


WALLACE, Judge.

　　　　　　George O. Shrader challenges his judgment and sentences for one count

of first-degree felony murder and two counts of sexual battery with the use of a deadly

weapon or actual physical force likely to cause serious personal injury following a jury

trial.  We conclude that the trial court did not abuse its discretion in denying Mr.

Shrader's motion for mistrial made after the fleeting exposure of a few of the jurors to a

newspaper article that referenced Mr. Shrader's prior murder conviction.  However,

because the State failed to prove that the victim did not consent to the sexual contacts

or that she sustained her injuries contemporaneously with the sexual acts, we reverse

the convictions for sexual battery.  The reversal of the sexual battery convictions

requires reversal of the felony murder conviction, which was based upon the jury's

findings of guilt on the sexual battery counts.  Thus, we remand for a new trial for

second-degree murder.

## I.  THE FACTUAL BACKGROUND

The charges against Mr. Shrader arose from the killing of a young woman

in the early morning hours of January 27, 1986, in Hillsborough County.  The victim was

last seen at the 18 Wheeler Bar in Gibsonton, Florida, around midnight on January 26,

1986.[1]  Her partially nude body was discovered at 7:24 a.m. on January 27, 1986, in the

middle of a dirt road at Whiskey Stump, an undeveloped peninsula of land south of

Gibsonton that juts into Tampa Bay.  The investigation of the victim's murder went cold

within a few weeks after it had begun.

Twenty-one years later, in March 2007, Detective Chris Fox of the

Hillsborough County Sheriff's Office and Agent James Noblitt of the Florida Department

of Law Enforcement decided to reopen the case and to review the physical evidence.

They sent two soil samples taken from the crime scene that contained apparent blood to

---

[1]January 26, 1986, was the date of Super Bowl XX between the Chicago Bears of the National Football Conference and the New England Patriots of the American Football Conference.

the FDLE lab for DNA testing, along with anal, oral, and vaginal swabs taken from the victim. Both soil samples tested positive for blood, and a partial DNA profile was developed for one soil sample. Partial DNA profiles were found in both the epithelial cell fraction and the sperm cell fraction of the rectal swab, with the profile from the sperm cell fraction being consistent with the partial profile from the soil sample.

The partial DNA profiles were entered into CODIS,[2] which presented no immediate hits. But in 2010, after Mr. Shrader was convicted on an unrelated charge that required him to submit a DNA sample, CODIS matched Mr. Shrader's known DNA profile with the partial profiles developed from the soil sample and rectal swab in the victim's case. Ultimately, on May 19, 2011, a grand jury returned an indictment against Mr. Shrader on the following charges: first-degree premeditated murder of the victim with a weapon, a violation of section 782.04(1)(a), Florida Statutes (1985); one count of sexual battery of the victim (penetration or union of penis with vagina) with a deadly weapon or physical force likely to cause serious personal injury, a violation of section 794.011(3), Florida Statutes (1985); and one count of sexual battery of the victim (penetration or union of penis with anus) with a deadly weapon or physical force likely to cause serious personal injury, a violation of section 794.011(3).

## II. THE TRIAL

At Mr. Shrader's trial, the State presented evidence of the victim's activities on January 26, 1986, which was Super Bowl Sunday, including her visits to the Happy Days Lounge, the East Side Lounge, and the 18 Wheeler Bar in Gibsonton.

---

[2]CODIS is an acronym for the "Combined DNA Index System" operated by the Federal Bureau of Investigation.

- 3 -

Although there was evidence that Mr. Shrader also patronized the 18 Wheeler Bar and the East Side Lounge on occasion, no witness placed him at either of these locations on January 26 or 27, 1986, and no witness saw Mr. Shrader and the victim together that night. In addition, there was no direct evidence about how or when the victim came to be at Whiskey Stump.

The evidence reflected that the victim was found around 7:24 a.m. on January 27 in the middle of a dirt road at Whiskey Stump undressed except for a yellow T-shirt. There was no other clothing at the scene. Earlier that night, the victim had been seen wearing jeans, a blue shirt with writing, and a black, silky jacket. There was no explanation of how the victim came to be clad in the yellow T-shirt. She had been stabbed thirty-six times, including four defensive-type wounds to her left arm and right hand. Although the temperature was below or near freezing when a sheriff's deputy discovered the body, the body was still warm. There were tire tracks that were casted, but were never linked to any vehicle. However, soil samples taken from around the body included Mr. Shrader's blood. And when Mr. Shrader appeared at the courthouse for fingerprinting in an unrelated case on January 27, the officer was not able to take fingerprints of his right hand because it had been lacerated. Later, Mr. Shrader gave several inconsistent stories about how he had cut his hand.

The medical examiner, Dr. Charles Diggs, testified that the first stab wounds occurred to the victim's chest area and that she was moving around as she was stabbed multiple times. He also stated that the victim was likely to have been attacked and killed where her body had been found because of the amount of the blood at the scene and because the attacker's blood was apparently also found at the scene. Dr.

Diggs observed that it was common for an attacker stabbing a victim to injure himself or herself during the attack.

The State introduced evidence at trial that Mr. Shrader's sperm cells were found in both the victim's vagina and anus. However, Dr. Diggs testified that "there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum" to suggest a sexual battery. But the fact that there was no evidence of such trauma did not mean that a sexual battery did not take place. Many victims of sexual battery do not have evidence of sexual trauma.

The State also introduced evidence that when Detective Fox and Agent Noblitt confronted Mr. Shrader, he denied remembering the victim or being with her on the night of the murder. He denied that he had sex with her, and he denied that he knew of or had ever been to Whiskey Stump. The State's theory was that Mr. Shrader drove himself and the victim from the 18 Wheeler Bar to Whiskey Stump where he committed the two sexual batteries on her at knifepoint and then killed her by stabbing her. However, Mr. Shrader, who was nineteen years old at the time, did not own a vehicle, and there was no proof that he had access to one.

At the conclusion of the State's case, Mr. Shrader moved for a judgment of acquittal on the two sexual battery counts and the felony murder theory, citing Bigham v. State, 995 So. 2d 207 (Fla. 2008), and arguing that the State's evidence failed to establish that any sexual battery had occurred. More specifically, defense counsel argued that the State had failed to prove that there was any evidence of sexual trauma to the victim or that any sexual contact between the victim and Mr. Shrader was not consensual. Defense counsel argued "that there's no evidence produced by the State

to prove that they did not have consensual sex; and, then ultimately, later, she was killed. That activity of sex would have occurred before the killing and therefore would not be sexual battery if it was consensual in nature." Further, counsel argued that "[s]imply because there was DNA found . . . it in no way means that they did not have consensual sex prior to any killing occurring, which would not be felony murder."

The trial court denied the motion as to the two sexual battery counts and the related theory of felony murder. The jury returned a verdict in which it declined to find Mr. Shrader guilty of premeditated murder, but instead found him guilty of felony murder based upon its finding of guilt on the two sexual battery counts. Because the jury found Mr. Shrader guilty of first-degree felony murder based upon its findings of guilt on the two sexual battery counts, the jury did not address whether the State had established that Mr. Shrader possessed the requisite intent for second-degree murder. The trial court denied Mr. Shrader's motion for new trial and for judgment of acquittal after the verdict.

### III. THE NEWSPAPER ARTICLE

Mr. Shrader's trial began on April 29, 2013, and lasted for five days. On the morning of May 1, 2013, the third day of the trial, the trial court raised the issue with the parties that some of the jurors may have seen an article about Mr. Shrader and the trial in a newspaper.[3] The article in question was titled, "He thought he got away with it." The article featured a photograph of Mr. Shrader at the trial with a caption that read,

---

[3]The newspaper was the type of publication commonly known as a "freesheet" or "giveaway." The trial judge noted that the newspaper in question was "commonly handed out for free around the courthouse."

"George Shrader, 46, convicted of second-degree murder in 1986 for killing his uncle in a bar fight, faces another murder charge this week."

The trial court brought in one of two bailiffs at the trial who stated that she saw several jurors standing around a table with the newspaper article open on the table. The bailiff stated that one juror, Juror 12, had the article open and one or two other jurors were looking at it. But the jurors told her that they had just seen the article and had not read it. It did not appear that any discussions were occurring. The bailiff then confiscated the newspaper. The parties agreed to bring the fourteen members of the jury panel (twelve jurors and two alternates) in individually for questioning about what each of them had seen or read.

Many of the jurors were not even aware of the article or that the newspaper had been in the jury room, apparently because they were not in the jury room at the time of the incident. None of the jurors had read or had seen any of the other jurors read the article in question.

Juror 3 stated that another juror told him not to look at the newspaper page with the article because the juror had noticed an article about the case.

Juror 10 stated that Juror 13 had the newspaper in the jury room, but when he opened the page and saw the picture of Mr. Shrader, Juror 13 "said, oh, there's something in here. Don't look at it, and [he] turned the page." He did not say anything else about it. Then the bailiff removed the newspaper.

Juror 12 similarly stated that there was a newspaper in the jury room and that Juror 13 was flipping through it. As he did that, "we saw the picture and closed it right away. We did not look at the words or anything." She stated that she saw the

picture briefly, out of the corner of her eye, and did not read anything around it. Juror 13 was not reading the newspaper, just flipping, then right away slammed it closed.

Juror 13 also stated that he had the newspaper and was flipping through it. He admitted that he saw a picture, but stated that he did not read anything around it and turned the page. He said that he flipped through the newspaper for a total of about forty-five seconds and that the newspaper was turned to the page with the defendant's picture for about three seconds. Then the newspaper was taken from him. None of the jurors stated that they had been exposed to anything that would prevent them from being fair and impartial in Mr. Shrader's trial.

At the conclusion of the questioning, defense counsel moved for a mistrial on the basis that the jury had been tainted by the newspaper article. Defense counsel suggested that the jurors who had seen the article had reason not to be fully candid about what they had seen because they had been instructed by the court not to look at the news media. Because the caption under Mr. Shrader's picture referred to a prior conviction for second-degree murder, defense counsel argued that Mr. Shrader could not receive a fair trial. The State responded that, in fact, the jury acted the way it had been instructed. Contrary to defense counsel's statement, the trial court had instructed the jurors not to read any articles about the trial rather than instructing them not to read any newspapers. When the jurors saw the photograph in the newspaper, they flipped the page and avoided the article.

The trial court denied Mr. Shrader's motion for mistrial based on the following detailed finding of facts:

> The court is going to find that it conducted a thorough
> inquiry of each of these jurors individually. I've allowed a

thorough inquiry of the deputies. The one thing that is clear is, no, there is [no] evidence that they actually read any reports or other – the evidence suggests that they were in there. There was a paper open somewhere to a page at some point obviously to the page that had this photo that apparently they did exactly what I told them. As soon as he saw the picture, they stopped. That is what the evidence indicates, and the testimony from our deputies here today, while it says they were in the area and may have been looking towards the paper is not contradictory to what I've [heard] from 14 individuals who came in and were subjected to full inquiry.

Accordingly, I'll specifically find that they have not, since the allegation is that they have been tainted, they have not been tainted. They have not been privy to information that is going [to] render them unable to be fair and impartial in discharge of their duties here.

The court also indicated that it would amend its instructions to the jury so that instead of just avoiding reports about this case, the jury would be directed to avoid exposure to all news reports: "I am going to be directing that they not only not read any news reports about this case, but that they not read any newspaper at all for the duration of this trial and that they not see any news program or listen to any news radio or TV." The trial court instructed the jury along these lines and reiterated the instructions on multiple occasions throughout the remainder of the trial. Notably, Juror 13 was an alternate and did not retire with the jury to deliberate on Mr. Shrader's case.

### IV.  MR. SHRADER'S APPELLATE ARGUMENTS

On appeal, Mr. Shrader raises two points. First, he argues that the trial court erred in denying his motion for mistrial because the jury was tainted—making it impossible for him to receive a fair trial—when one or more of the jurors viewed the article about him and the trial in the newspaper. Second, Mr. Shrader contends that the trial court erred in denying his motion for judgment of acquittal on the two sexual battery

charges because the State failed to prove that the alleged sexual batteries had occurred. In particular, Mr. Shrader asserts that the State failed to prove that any sexual encounter between him and the victim was not consensual, leaving open the possibility that the killing occurred later as an unrelated event. In addition, he argues that his conviction for first-degree felony murder must also be reversed because it is dependent on the proof of at least one of the two alleged sexual batteries. Thus he asserts that he is entitled to a new trial for second-degree murder. We will consider each of these points separately below.

## V. DISCUSSION

### A. The Exposure of Some of the Jurors to the Newspaper Article

"A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." England v. State, 940 So. 2d 389, 401-02 (Fla. 2006). We review the trial court's denial of Mr. Shrader's motion for mistrial for abuse of discretion. See id. at 402.

Our review of the record reveals ample evidence to support the trial court's findings about the jury's exposure to the newspaper article and that the jurors had not, in fact, been tainted by the article. In addition, the trial court's revised instruction to the jury to avoid all sources of news for the duration of the trial was appropriate. Because the trial court thoroughly investigated the incident and reasonably determined that the jury had not been tainted, we conclude that the trial court did not abuse its discretion in denying the motion for mistrial. See England, 940 So. 2d at 402; see also Brown v. United States, 411 U.S. 223, 231 (1973) (" 'A defendant is entitled to a fair trial but not a

- 10 -

perfect one,' for there are no perfect trials." (quoting <u>Bruton v. United States</u>, 391 U.S. 123, 135 (1968))).

## B. The Sufficiency of the Evidence to Prove the Alleged Sexual Batteries

"When faced with a motion for judgment of acquittal, the trial court must measure the legal adequacy of the evidence before presenting the case to the jury for deliberation. 'Sufficient evidence is such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded.' " <u>State v. Shearod</u>, 992 So. 2d 900, 903 (Fla. 2d DCA 2008) (quoting <u>Tibbs v. State</u>, 397 So. 2d 1120, 1123 (Fla. 1981)). We review the denial of Mr. Shrader's motion for judgment of acquittal de novo. <u>Id.</u>

Section 794.011, Florida Statutes (1985), provides, in pertinent part, as follows:

> (3) A person who commits sexual battery upon a person 12 years of age or older, <u>without that person's consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury</u> is guilty of a life felony, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(Emphasis added.) Here, Mr. Shrader argues that the State failed to establish a prima facie case that either of the two alleged sexual batteries occurred because the State failed to introduce evidence that the sexual contact occurred without the victim's consent or that during the sexual contact, Mr. Shrader used or threatened to use a deadly weapon or actual physical force likely to cause serious personal injury.

In arguing that the evidence was insufficient to establish the two counts for sexual battery, Mr. Shrader relies—as he did in the trial court—primarily on <u>Bigham v.</u>

State, 995 So. 2d 207 (Fla. 2008). But in Bigham, the trial court ruled that the evidence of sexual battery—among other charges—was not sufficient to go to the jury. Id. at 210. Thus the Florida Supreme Court never addressed the issue of the sufficiency of the evidence in Bigham to establish a sexual battery in its decision. The trial court's ruling does not have any precedential value. We do not find Bigham persuasive on Mr. Shrader's argument that the evidence on the sexual battery counts was insufficient to go to the jury in his case. Also, in Bigham, the defendant admitted when first interviewed that he had had two consensual sexual encounters with the victim. Id. In contrast, Mr. Shrader consistently denied any contact with the victim.

The State relies primarily on Fitzpatrick v. State, 900 So. 2d 495 (Fla. 2005), in arguing that the evidence was sufficient on the sexual battery counts to create a jury issue. The victim in Fitzpatrick was found about 3:00 a.m. alive, walking by the side of the road. Id. at 503. She was nude and her throat had been slit. Id. She subsequently died as a result of her injuries. Id. The victim had a bloody undergarment wrapped around her waist. Id. at 504. Medical evidence suggested that she had never put the undergarment back on after sexual activity. Id. In addition, the victim stated before she died that she had been stabbed at the location where she was found. Id.

The defendant in Fitzpatrick denied having sexual intercourse with the victim until he was confronted with DNA evidence. Id. at 506. He also tried to persuade his sister, who was a nurse, to procure blood samples for him after the police had asked him to submit a blood sample. Id. There was also medical testimony that the victim's injuries were consistent with sexual battery and that the sexual battery had occurred within a couple of hours before she was found. Id. at 504. Moreover, two witnesses

saw the victim with the defendant three hours before she was found. Id. at 505. On the other hand, Fitzpatrick claimed that he had last seen the victim between 9:30 a.m. and noon when they had consensual sex. Id. at 506.

In Fitzpatrick, the supreme court found that the evidence was sufficient to support a conviction for felony murder based on a theory of sexual battery as the underlying felony. In reaching this conclusion, the court relied in part on the defendant's denial of sexual intercourse with the victim until confronted with DNA evidence and his attempt to falsify evidence by getting the blood samples. Id. at 507-08. Although the court did not specifically rely on it, the victim's failure to put her underwear and other clothing back on after the sexual encounter was suggestive of a forcible rather than a consensual encounter, as was the medical evidence that was consistent with sexual trauma.

As the State observes, the facts in Fitzpatrick have some similarities to Mr. Shrader's case. Like the defendant in Fitzpatrick, Mr. Shrader was untruthful in denying that he had experienced a sexual encounter with the victim. Mr. Shrader also denied having been to Whiskey Stump, when he clearly had. Mr. Shrader also told evasive stories about how his hand had been cut. Also, as in Fitzpatrick, the fact that the victim was wearing nothing but a T-shirt on a bitterly cold morning suggests that she did not have an opportunity to get dressed after having sexual intercourse. These facts could suggest an inference that the sexual intercourse between Mr. Shrader and the victim was forcible and not consensual.

Nevertheless, the evidence that a sexual battery had occurred was considerably stronger in Fitzpatrick than in Mr. Shrader's case. There was medical

testimony in Fitzpatrick that the victim had suffered sexual trauma and that the defendant was seen with her shortly before the sexual activity and the infliction of the injuries that led to her death. In addition, the victim stated that she had been attacked at the location where she was found nude and with a bloody undergarment around her waist, suggesting that the sexual activity and the stabbing had occurred in a close temporal sequence.

In the case before us, there is no evidence of the timing of the sexual intercourse between the victim and Mr. Shrader. The sexual activity between them could have occurred well before the infliction of the fatal injuries, and there is no medical evidence to suggest that the victim suffered any sexual trauma. Instead, the medical evidence was inconclusive regarding the use of force in connection with the sexual encounter that had occurred. It is entirely possible, based upon the evidence presented, that Mr. Shrader and the victim had consensual sexual intercourse and she was killed subsequently for reasons unknown. Granted, the victim's clothing was gone, but we do not know what became of it or why the victim was partially nude when her body was found.

The State points to the evidence of Mr. Shrader's apparent evasions about his whereabouts and not remembering the victim as evidence of his commission of the alleged sexual batteries. However, Mr. Shrader may have chosen to give evasive answers to the investigators' questions about such topics whether or not he had committed the alleged sexual batteries. And as far as the body's state of undress, one can do no more than speculate about the reason for that. It is even possible that the

victim was fully clothed when she was stabbed to death. The killer or killers could have removed her clothing after the stabbing for a variety of reasons.

After a thorough examination of the record, we conclude that the State's evidence failed to prove that the victim did not consent to the sexual acts or that Mr. Shrader used or threatened to use a deadly weapon or used physical force likely to cause serious personal injury while in the process of committing the alleged sexual batteries. For this reason, the trial court should have granted Mr. Shrader's motion for judgment of acquittal on the two counts of sexual battery and the theory of felony murder that was based on the commission of those offenses. Moreover, because the jury acquitted Mr. Shrader of first-degree murder on a theory of premeditation, we must remand for a new trial on the charge of second-degree murder. The jury found Mr. Shrader guilty of first-degree murder on a theory of felony murder based upon the jury's determination that the victim's death occurred as a consequence of and while Mr. Shrader was engaged in the commission of the alleged sexual batteries. Thus the jury never considered or determined whether Mr. Shrader acted with the requisite intent to establish his guilt of second-degree murder. See § 782.04(2) ("The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree . . . ."). Mr. Shrader is entitled to the jury's determination of all of the elements necessary to establish second-degree murder, the next lesser-included offense after first-degree murder. See State v. Sigler, 967 So. 2d 835, 844 (Fla. 2007). Accordingly, we remand

this case to the trial court for Mr. Shrader to receive a new trial for the offense of second-degree murder.

## VI. CONCLUSION

To summarize, the trial court did not abuse its discretion in denying Mr. Shrader's motion for mistrial based on the presence in the jury room of the newspaper article. The incident regarding the fleeting exposure of some of the jurors to the newspaper article rendered Mr. Shrader's trial less than perfect, but not unfair. Because the State's evidence failed to prove that the victim did not consent to the sexual acts with Mr. Shrader, the trial court erred in denying Mr. Shrader's motion for a judgment of acquittal on the two counts for sexual battery. Accordingly, we reverse the judgment and sentences for the two counts of sexual battery. The reversal of the convictions for sexual battery eliminates the basis for the felony murder conviction. The jury has acquitted Mr. Shrader of first-degree murder on a premeditation theory. Thus we reverse the judgment and sentence for felony murder and remand for a new trial against Mr. Shrader for second-degree murder.

Reversed; remanded with directions.


NORTHCUTT, J., Concurs.
BADALAMENTI, J., Concurs in part and dissents in part with opinion.

- 16 -

BADALAMENTI, Judge, concurring in part and dissenting in part.

I fully concur with the majority's opinion that the trial court did not abuse its discretion by denying Mr. Shrader's motion for mistrial based on purported juror taint. I respectfully dissent, however, from the majority's reversal of the trial court's denial of Mr. Shrader's motion for judgment of acquittal. I would affirm the trial court's denial of Mr. Shrader's motion for judgment of acquittal and uphold the jury's guilty verdict. In my judgment, the State successfully refuted Mr. Shrader's reasonable hypothesis of innocence for sexual battery, which served as the underlying felony to establish the jury's felony murder conviction. In particular, the State presented competent, substantial evidence that the sexual acts committed upon the victim were nonconsensual. Accordingly, I believe the case was properly submitted to the jury for its verdict.

"A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury is guilty of a life felony . . . ." § 794.011(3), Fla. Stat. (1985). Under Florida's sexual battery statute, consent is a relative term to be interpreted under the circumstances of each case and "is essentially a question for the jury." Hufham v. State, 400 So. 2d 133, 135 (Fla. 5th DCA 1981). Where a defendant raises consent as a defense to sexual battery, the State may prove that the victim did not consent purely on the basis of circumstantial evidence. See Caylor v. State, 78 So. 3d 482, 494 (Fla. 2011).

"Generally, a motion for judgment of acquittal should be denied '[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt.' "

Westbrooks v. State, 145 So. 3d 874, 877 (Fla. 2d DCA 2014) (quoting Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002)). "However, in cases in which the evidence is 'wholly circumstantial,' a special standard of review applies: 'the evidence must also exclude the defendant's reasonable hypothesis of innocence.' " Id. Even so, in a purely circumstantial evidence case, "[t]he [S]tate is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." McDuffie v. State, 970 So. 2d 312, 330 (Fla. 2007) (quoting Orme v. State, 677 So.2d 258, 262 (Fla.1996)). In most cases, courts classify DNA evidence as circumstantial evidence. See, e.g., Dausch v. State, 141 So. 3d 513, 518 (Fla. 2014); Thorp v. State, 777 So. 2d 385, 390 (Fla. 2000); Washington v. State, 653 So. 2d 362, 365-66 (Fla. 1994). But where DNA evidence is considered together with other circumstantial evidence which tends to exclude all reasonable hypotheses of innocence, the trial court may properly deny a motion for judgment of acquittal. See Washington, 653 So. 2d at 366.

Because mental intent is seldom proven by direct evidence, "the absence of direct proof on the question of the defendant's mental intent should rarely, if ever, result in a judgment of acquittal." Wallace v. State, 764 So. 2d 758, 760 (Fla. 2d DCA 2000) (quoting Ehrlich v. State, 742 So. 2d 447, 450-51 (Fla. 4th DCA 1999)). The same logic applies to circumstantial evidence of a victim's consent to violent contact—particularly where the victim is unavailable to testify. See State v. Clyatt, 976 So. 2d 1182, 1184 (Fla. 5th DCA 2008) ("We see no distinction between the use of circumstantial evidence to prove state of mind in these contexts and the State's

attempted use of circumstantial evidence to prove the victim's lack of consent in this battery case."). Accordingly, "[q]uestions of consent, force, resistance, and fear <u>are particularly within the province of the jury to determine</u>." <u>State v. Hudson</u>, 397 So. 2d 426, 428 (Fla. 2d DCA 1981) (emphasis added) (citing <u>Berezovsky v. State</u>, 335 So. 2d 592, 593 (Fla. 3d DCA 1976), <u>rev'd in part on other grounds</u>, 350 So. 2d 80 (Fla. 1977)).

The circumstantial evidence in this case is more than sufficient to survive a motion for judgment of acquittal and rebut any hypothesis of innocence which may be considered reasonable.

A law enforcement officer discovered the victim's warm body on the "extremely, extremely bitterly cold" morning of January 27, 1986, in an area called Whiskey Stump.[4] By Mr. Shrader's own admission, Whiskey Stump was known as a lovers' lane—a place where people go to engage in sexual activity. The victim was laying in the middle of a dirt road, in full view of any passerby, surrounded by blood spatters. She had been stabbed thirty-six times, was without the clothes she was wearing earlier that night, and was wearing only a yellow t-shirt. The assistant medical examiner who analyzed the victim's body opined that the victim was probably killed where her body was found. It is undisputed that semen containing Mr. Shrader's DNA was found inside of the victim's vagina and anus. It is likewise undisputed that blood found in the soil at the scene of the murder matched Mr. Shrader's DNA and that Mr. Shrader had cuts on his right hand later that morning which prevented him from giving fingerprints. During trial, Mr. Shrader's counsel argued "[i]t is a reasonable hypothesis to assume that at some point, if the State is arguing that Mr. Shrader killed this

---

[4]The officer testified that the temperature "was in the 30s."

- 19 -

decedent, that there's no evidence produced by the [S]tate to prove that they did not have consensual sex; and, then ultimately, later, she was killed." Taken together, the circumstantial evidence, however, renders this theory of innocence unreasonable in a number of respects.

First, the assistant medical examiner's testimony suggests that the victim was killed in the same location where her body was found—Whiskey Stump. This is supported by an officer's testimony that the victim was warm to the touch, despite it being "extremely, extremely bitterly cold" that morning. As Mr. Shrader himself admitted, Whiskey Stump was a place known for people engaging in sexual activity. Taken together, the reputation of Whiskey Stump, the fact that the victim's body was "warm" to the touch, and the testimony of the assistant medical examiner all undermine the hypothesis that the victim's having sex with Mr. Shrader was temporally disconnected with the victim's subsequent murder.

Second, the victim's state of undress undermines the hypothesis that the sex she had with Mr. Shrader at Whiskey Stump was consensual. The victim was discovered wearing none of the clothes she was wearing earlier in the night and was clad only in a yellow t-shirt. Courts have used the circumstances in which a victim was found to infer lack of consent in sexual battery cases, including the victim's state of undress. See McWatters v. State, 36 So. 3d 613, 634 (Fla. 2010) (holding that a jury could have concluded that defendant's sex with a victim could be inferred from "disturbed dirt" surrounding victim's body as well as the victim's "damaged undergarments"); Williams v. State, 967 So. 2d 735, 755-56 (Fla. 2007) (holding that a jury could have inferred lack of consent where a pregnant victim answered the door for

- 20 -

defendant who raped her, and police later discovered victim completely nude and found her blood-stained shorts and panties under her bed); see also State v. Ortiz, 766 So. 2d 1137, 1142-43 (Fla. 3d DCA 2000) (finding that a prima facie case for sexual battery had been established where "victim was found beaten and virtually nude in an isolated wooded area of a park with her shirt pulled up around her head and her shorts down around her ankles"); L.J. v. State, 421 So. 2d 198, 199 (Fla. 3d DCA 1982) ("An attempt to commit such an act [sexual battery] would certainly be facilitated by the overt act of attempting to remove the pants of the victim."). The victim's lack of clothing further undermines Mr. Shrader's hypothesis of innocence for the simple reason that, if the sex was consensual and disconnected from the murder in either time or place, it is more likely that the victim would have been found wearing her own clothes. It is common sense that people who finish engaging in sexual intercourse generally put their clothes back on when they have the opportunity. Cf. Cox v. State, 605 So. 2d 978, 979 (Fla. 4th DCA 1992); Russell v. State, 576 So. 2d 389, 390 (Fla. 1st DCA 1991). Here, the victim was found lying outside, nearly naked on an extremely cold night, in the middle of a dirt road—a place where victim was unlikely to have consented to intercourse. It strains reason to suggest that any sexual activity the victim engaged in at Whiskey Stump was consensual.

Third, there is record evidence that a struggle occurred, which is indicative of lack of consent. See McWatters, 36 So. 3d at 633; Zack v. State, 753 So. 2d 9, 18 (Fla. 2000). When prompted to view a crime scene photograph admitted into evidence, the officer who found the victim's murdered body testified, "I know there's signs of what appears to be a struggle right there." The likelihood of a struggle is reinforced by Mr.

Shrader's blood being found near the victim's body and testimony that Mr. Shrader came home with a bleeding hand on the morning when the victim's body was discovered. It is unreasonable to believe that the victim struggled with Mr. Shrader and that Mr. Shrader's hand was lacerated during the course of a consensual sexual encounter. Although a hypothesis could be formulated to suggest that consensual sexual activity occurred prior to the obviously nonconsensual murder, it is difficult to formulate a reasonable one on this record. Finding that the State met its burden to rebut Mr. Shrader's hypothesis of innocence, the trial court recognized that Mr. Shrader's hypothesis of innocence was a question within the province of the jury.

Fourth, the testimony presented revealed that Mr. Shrader tended to change his story of events as it suited him. A defendant's inconsistent statements may be used to undermine the reasonableness of the defendant's proposed hypothesis of innocence when deciding a motion for judgment of acquittal. Bannister v. State, 132 So. 3d 267, 280-81 (Fla. 4th DCA 2014).

Prior to being confronted with DNA evidence that he had sex with the victim, Mr. Shrader not only denied that he and the victim had any sexual contact, but completely denied ever having met the victim or otherwise knowing who she was. Clearly, the DNA evidence left behind in his blood and semen contradicts that story. Mr. Shrader's inconsistencies do not stop there. On the night of the murder, Terry Albritton, one of Mr. Shrader's then-roommates, testified that Mr. Shrader came home with a bleeding hand. Mr. Shrader gave no fewer than three inconsistent accounts of how he cut his hand on the night of the murder. Ms. Albritton testified that Mr. Shrader first told her he had cut his fingers on a nail sticking up from a bannister outside of their

apartment. On the morning after the murder, Mr. Shrader appeared in a courthouse in Hillsborough County for reasons unrelated to the murder in this case. Mr. Shrader was unable to have his right hand fingerprinted due to cuts on his pinky, ring finger, and middle finger. Later that same day, when Mr. Shrader went to have his fingers sutured at Tampa General Hospital, he informed his attending doctor that he had cut his hand while working as a roofer. After the case was reopened leading to this conviction, Mr. Shrader was interviewed by two officers from the Florida Department of Law Enforcement. In the course of the interview, Mr. Shrader told the officers that he cut his hand on a knife while reaching into a dishwasher. At trial, Ms. Albritton contradicted Mr. Shrader's account by testifying that Mr. Shrader never washed the dishes while they were roommates <u>and</u> that they did not even own a dishwasher.

The majority dismisses Mr. Shrader's myriad retellings by speculating that Mr. Shrader may have chosen to lie to law enforcement "whether or not he had committed the alleged sexual batteries." Although the majority implies that Mr. Shrader may have lied to cover up a murder and not a sexual battery, this theory does not hold up against the other circumstantial evidence which suggests that the murder and the sexual battery were contemporaneous. The presence of Mr. Shrader's blood at the scene, coupled with the multiple accounts of how he cut his hand, suggest that he was lying to cover up a murder which took place in the course of a sexual battery. "When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the <u>consciousness of guilt</u> which may be inferred . . . ." <u>Straight v. State</u>, 397 So. 2d 903,

908 (Fla. 1981) (emphasis added). Whether Mr. Shrader's multiple evasions revealed a consciousness of guilt was for the jury to determine. It is not the judiciary's role to sit as a thirteenth juror.

Fifth, I do not believe it is sufficient to classify evidence as "circumstantial" without also considering its relative strength. Generally, the relationship between the strength of circumstantial evidence against a defendant's purported hypothesis of innocence and the reasonableness of a defendant's purported hypothesis of innocence should be inversely proportional. "[T]he stronger the circumstantial evidence, the more likely that a rational jury will be justified in rejecting explanations other than the guilt of the accused as unreasonable." Knight v. State, 107 So. 3d 449, 458 (Fla. 5th DCA 2013), approved, 186 So. 3d 1005 (Fla. 2016). Here, the circumstantial evidence connecting Mr. Shrader to the sexual battery and murder of the victim is quite powerful, which diminishes the value of Mr. Shrader's theory that his sexual contact with the victim was consensual. As such, the trial court properly denied Mr. Shrader's motion for judgment of acquittal and allowed a jury of Mr. Shrader's peers to weigh the relative strength of the evidence against him.

Lastly, I disavow any suggestion that lack of physical trauma to a victim's vagina or rectum implies that the victim necessarily consented to sexual activity. The assistant medical examiner testified that "there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum." He then clarified:

> It doesn't mean that sexual battery didn't take place. It just meant that there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum were left. And, of course, you have many

<u>people who are raped in which you don't see the evidence of this type of thing</u>, but we didn't see that in this case."

(Emphasis added.)

The victim here falls into the latter category—those who do <u>not</u> show evidence of sexual trauma. There is record evidence of a struggle by a woman who is not alive to testify that she did not consent. The State presented evidence that drops of blood containing Mr. Shrader's DNA were found in proximity of the victim's bludgeoned body, containing thirty-six stab wounds and semen that tested positive for Mr. Shrader's DNA.

In my judgment, the State presented competent, substantial evidence that the sexual contact was not consensual. As such, I would affirm the trial court's denial of Mr. Shrader's motion for judgment of acquittal. I therefore respectfully dissent in part from the decision of my esteemed colleagues. I fully concur in the majority's holding that the trial court did not abuse its discretion by denying Mr. Shrader's motion for a new trial based on purported juror taint.